ESAÚL SÁNCHEZ CARAMBOT, ROBERTO ORTIZ FELICIANO, demandantes y recurridos, *v.* FEDERICO M. MATHEU, DIRECTOR, COLEGIO UNIVERSITARIO DE HUMACAO, demandado y recurrente.

*Número:* R-77-136        *Resuelto:* 17 de junio de 1982

*José Andreu García*, abogado de la parte recurrente; *Fernando Olivero Barreto*, abogado de los recurridos.

PER CURIAM: El 7 de setiembre de 1976, la Hermandad de Empleados No Docentes de la Universidad de Puerto Rico y el Sindicato de Trabajadores de la misma institución, decretaron un paro huelgario, demandando de la administración universitaria mayores beneficios económicos. Varios grupos estudiantiles se unieron al movimiento huelgario suscitándose violentas manifestaciones y mítines desordenados que en el recinto riopedrense, por ejemplo, redundaron en actos vandálicos contra la propiedad universitaria, en amenazas contra funcionarios del recinto, y en irrupciones violentas en las aulas, desalojándose de las mismas a profesores y estudiantes. Se ocasionó daño considerable a las facilidades sanitarias, se lanzaron agentes químicos que causaban olores desagradables; y se volcó el contenido de los zafacones por los predios de la institución. Se estimaron los

daños en $136,898.40. Ante situación tan precaria las autoridades universitarias del Recinto de Río Piedras se vieron obligadas a suspender toda actividad académica y parte de la administrativa por el término comprendido entre el martes 14 de setiembre de 1976 y el miércoles 27 de octubre del mismo año.

En el Recinto de Humacao también se sintieron los efectos lamentables que suelen producir algunos movimientos huelgarios. Una cadena de metal fue lanzada al aparato transformador de la unidad de energía eléctrica que sirve al recinto. Se provocó el desbordamiento de inodoros en varios edificios, entre otros, en la biblioteca del recinto. Se lanzaron a los conductos de los acondicionadores de aire ampolletas que contenían agentes químicos intensamente malolientes, lo que obligó, en repetidas ocasiones, a desalojar varios salones de clase. Ninguno de esos actos surgió en Humacao como consecuencia de demostración estudiantil alguna.

Para enfrentar esa situación que hemos reseñado y tomando también en consideración el estado de cosas en Río Piedras, basado en experiencias anteriores, el señor Director del Colegio Universitario de Humacao decretó el 8 de setiembre de 1976 la suspensión de todas las actividades extracurriculares de dicho Colegio Universitario(1) hasta tanto se normalizara la situación laboral, invocando para sus actuaciones las providencias pertinentes del Reglamento de Estudiantes. Esa primera orden expiró el 8 de octubre de 1976.

Mas, todavía para el 18 de octubre de 1976 prevalecía el estado huelgario. Considerando el señor Director del Colegio de Humacao que las circunstancias que motivaron su decisión de setiembre aún privaban sobre la institución, obtuvo autorización del Consejo de Educación Superior

(1) También en los recintos de Río Piedras, Mayagüez y Arecibo fueron proclamadas suspensiones por las autoridades universitarias en las actividades no lectivas.

para decretar una nueva suspensión de actividades extra-curriculares hasta el 6 de noviembre de 1976. Al finalizar la huelga de trabajadores el 27 de octubre de 1976 se dejó sin efecto en esa misma fecha el cese de las labores no lectivas.

Estando vigente la segunda moratoria de las actividades no académicas en el Colegio de Humacao, el martes 19 de octubre de 1976, comenzando a las 10:30 a.m. y durante unos 45 minutos, se celebró un mitin en el pasillo interior que da acceso a las distintas dependencias del Colegio, a una distancia de 15 pies de los edificios que albergan los departamentos de Administración y de Letras. La actividad, que reunió gran número de espectadores, se celebró sin la autorización del Director ni del Decano de Asuntos Estudiantiles y en el mismo los estudiantes Roberto Ortiz Feliciano y Esaúl Sánchez Carambot, aquí demandantes y recurridos, se dirigieron a los espectadores usando alta-voces. El ruido producido por la actividad no parece haber alcanzado intensidad suficiente para hacer imposible las tareas en los edificios adyacentes, aunque produjo la parali-zación de sus labores de un grupo de empleados.

Advertido el señor Director del Colegio de la conducta antes resumida de los estudiantes Sánchez y Ortiz, presentó contra éstos querella ante la Junta de Disciplina del Cole-gio, la cual, luego de los procedimientos de rigor, incluso una vista, encomendó que se impusiera a dichos estudiantes las siguientes sanciones: (1) a Roberto Ortiz Feliciano, una suspensión bajo probatoria "por el resto del presente año académico"; y (2) a Esaúl Sánchez Carambot, el retiro de la probatoria de que entonces disfrutaba y una suspensión absoluta "por el resto del presente año académico".

Considerando las recomendaciones de la Junta de Disci-plina, el 21 de enero de 1977 el señor Matheu se dirigió a los estudiantes Ortiz y Sánchez en sendas cartas. En una le comunicó al estudiante Ortiz la imposición de una probato-ria disciplinaria de seis meses a partir del 24 de enero de 1977, por violación de los incisos C3(a), C3(e), C3(h), C3(j) y

C3(k) del Art. 3(²) del Reglamento General de Estudiantes. En la otra carta le comunicó al estudiante Esaúl Sánchez Carambot, que por violación a las mismas disposiciones reglamentarias, se le retiraba la probatoria de que disfrutaba en aquel momento, se le suspendió del Colegio por seis meses a partir del 17 de enero de 1977, prohibiéndosele entrar a los terrenos, dependencias y facilidades bajo el control de la Universidad y se le imponía una probatoria disciplinaria de un año desde la fecha de su reingreso, autorizándole, sin embargo, a solicitar dicho reingreso para el primer semestre del año académico de 1977 a 1978.

Así las cosas, los demandantes iniciaron la presente acción ante la Sala de Humacao del Tribunal Superior de Puerto Rico, solicitando del Tribunal que dictara interdicto contra las autoridades universitarias para impedir que se pusieran en efecto las sanciones disciplinarias decretadas contra ellos; para que se ordenara a los demandados reconocer los derechos constitucionales de los demandantes; que se reinstalara a los demandantes como estudiantes regulares sin restricción de clase alguna y se eliminara de sus expedientes toda mención referente a las sanciones; que se declararan nulas, ilegales e inconstitucionales las actuaciones del señor Director del Colegio de Humacao; y, finalmente, que se concediera a los demandantes Sánchez y Ortiz las cantidades respectivas de $10,000 y $5,000 por concepto de daños y perjuicios sufridos.

---

(²) El inciso *a* prohíbe que los mítines interrumpan las tareas universitarias ordinarias; el *e* exige que no se impida el acceso y salida a las facilidades de la Universidad; el inciso *h* requiere autorización previa para el uso de altoparlantes; el *j* prohíbe mítines a una distancia menor de 250 metros de los salones de clase y de las oficinas; y el *k*, tal como lo transcribiremos luego, autoriza la prohibición de actividades extracurriculares cuando exista un peligro claro e inminente de que las mismas interfieran sustancial y materialmente con el orden institucional. Ahora bien, ante el Tribunal Superior no se suscitó controversia en cuanto a los incisos C3(a) y C3(e). Los recurridos alegaron en su demanda que el Director del Colegio adoptó en toda su extensión el informe de la Junta de Disciplina, la cual había recomendado la desestimación de las imputaciones a dichos incisos C3(a) y C3(e), párrafos 6 y 7 de la demanda. El demandado aceptó esa alegación, párrafo 2 de la contestación.

El Tribunal Superior acogió sustancialmente los planteamientos de los demandantes y el 3 de marzo de 1977 dictó sentencia en la que estimó constitucionalmente impermisible el cese de actividades extracurriculares decretado por las autoridades universitarias humacaeñas, disponiendo así la violación al inciso C3(k) (peligro claro e inminente) y estimando, además, que los estudiantes tampoco habían violado el inciso C3(h) (uso de altoparlantes) del Reglamento. En consecuencia ordenó a los demandados a: (1) respetar el derecho del demandante Esaúl Sánchez Carambot de entrada y acceso a los predios universitarios como cualquier otro estudiante; (2) eliminar de los records de los demandantes toda referencia a violaciones reglamentarias con excepción del inciso C3(j) del Art. 3; (3) readmitir al estudiante Esaúl Sánchez Carambot a su condición de estudiante regular; y (4) no imponer a los demandantes ninguna otra sanción por los hechos ocurridos el 19 de octubre de 1976. En cuanto a la reclamación de daños, el tribunal estimó que la misma no procedía, concediendo, sin embargo, un plazo a los demandantes para argumentar contra esa estimación. Comoquiera que el Tribunal Superior determinó que los demandantes sí violaron el inciso C3(j) del Reglamento de Estudiantes, referente a la reglamentación de lugares apropiados para la celebración de mítines y piquetes,(³) procedió entonces a utilizar su criterio en cuanto a qué sanción sería la más adecuada para punir esa sola violación. Así animado, rebajó de seis a dos meses el período de probatoria disciplinaria impuesto al estudiante Roberto Ortiz Feliciano, período que se contaría desde la notificación original, y redujo la suspensión impuesta a Esaúl Sánchez Carambot al tiempo cumplido al momento de dictarse sentencia.

Inconforme el demandado con la sentencia dictada,

---

(³) Los estudiantes no solicitaron la revisión de esa sanción, por lo que no está ante nos ese aspecto de la controversia. Véase P. A. Freund et al., *Constitutional Law*, 4ta ed., Boston, Little, Brown & Co., 1977, págs. 183–184.

acudió ante nos solicitando la revisión de la misma, a lo que accedimos. Ambas partes renunciaron al derecho que les concede el Reglamento de este Tribunal de someter alegato en apoyo de sus contenciones y dieron por presentados los mismos a base de sus escritos de solicitud de revisión y de oposición a la misma. Ha quedado así debidamente argumentada la controversia y está lista para su solución final. Veamos.

I

En *Rodríguez* v. *Srio. de Instrucción*, 109 D.P.R. 251 (1979), resolvimos que los derechos fundamentales de expresión y asociación que en nuestra Constitución se consagran, acompañan tanto a maestros como a estudiantes durante su permanencia en los predios escolares. Tratándose de universidades, esta norma constitucional comulga estrechamente con la esencia y razón histórica de esta institución, en la que como afirma Monroe de un modo claro, "la libertad de discusión, tanto política como eclesiástica y teológica encontró su primer hogar". P. Monroe, *Historia de la pedagogía*, traducción del inglés por María de Maeztu, Madrid, 1905, T. II, pág. 145.

En el pasado, aunque la mayor parte de las veces las simpatías de los grupos universitarios eran para las clases privilegiadas, muy a menudo se convirtieron en el intérprete del pueblo, en oposición al rey o la intriga eclesiástica, H. Rashdall, *The Universities of Europe in the Middle Ages*, Great Britain, 1936, Vol. I, pág. 540 *et seq.* El derecho de la universidad a emitir su opinión en el Gobierno y a ocupar un puesto en los parlamentos de Francia, de Inglaterra y de Escocia, es una prueba de su autoridad política y de que la universidad había llegado a ser un gran "estado". Cuestiones de Estado y controversias entre éste y la Iglesia, tales como los divorcios de Enrique VIII de Inglaterra y Felipe de Francia, fueron sometidas al arbitraje de las universidades. P. Monroe, *loc. cit., ante.* En fin, política, eclesiástica

y teológicamente, las universidades fueron desde temprano baluarte de libertad. La queja constante de que deseaban mezclarse con todos los asuntos importantes es una prueba de su influencia coercitiva sobre las arbitrariedades del rey y de los prelados. Solamente a ellas se concedía cierta libertad para expresar su opinión. La única clase social a la que era respetado su punto de vista opuesto a los de los monarcas era la de los estudiantes de la Universidad, aun en los casos en que estaban representados por gente "hostil y extraña". Y sólo ese ambiente de libertad y abstracción sustancial de la presión oficial podía producir las figuras que como Rogerio Bacon, Dante, Petrarca, Wicliffe, Huss y Copérnico engendraron el espíritu moderno.

Nuestro derecho histórico es testigo fiel del gran reconocimiento social de que han disfrutado las instituciones universitarias, así como sus profesores y estudiantes: "Et otrosi decimos que los cibdadanos de aquel logar do fuere fecho el estudio deben mucho honrar et guardar los maestros, et los escolares et todas sus cosas . . .". *Las Siete Partidas del Rey don Alfonso el Sabio*, Madrid, Ed. Atlas, 1972, T. II, Partida Segunda, Título XXXI, Ley II. Nuestro aprecio jurídico por la universidad y sus valores de libertad y estudio es, pues, muy antiguo y se remonta a tiempos anteriores a la concepción del derecho constitucional moderno.

En la América de nuestro tiempo esa tarea destacada que desempeña la universidad como centro de investigación, de estudio y de crítica social no ha perdido trascendencia.

La universidad latinoamericana se ha visto comprometida desde sus comienzos con la reforma social. La universidad luchó por su autonomía, la que se cristalizó con la Revolución universitaria de Córdoba en 1918. Desde que comenzó la reforma se proclamó el deber universitario de asumir el liderato en la sociedad y de servir a sus necesidades, definiéndose así la ubicación en las tareas universi-

tarias del estudio de lo político-social al margen de las preferencias del Estado. Así pues, en Latinoamérica la autonomía universitaria se concibe como el santuario donde conseguir una relativa libertad en el examen de las ideas. R. Mac-Lean y Esteríos, *La crisis universitaria en Hispanoamérica*, Instituto de Investigaciones Sociales, Universidad Nacional, México, 1956.

En este sentido, el definitivo reconocimiento que las libertades civiles reciben en todo el ordenamiento nacional de sociedades como la nuestra, no puede ser razón hábil para menoscabar las garantías de libertad de expresión y asociación que desde tiempos pretéritos gozan los estudiantes y profesores universitarios. Precisamente, para que las salvaguardas civiles no decaigan es imprescindible la crítica ilustrada, acuciosa y constante de parte de esos grupos dedicados al más elevado estudio. Callar sus denuncias puede poner en peligro las libertades que con tanta dificultad se plasmaron en un pasado no muy remoto. Se trata, como advertimos en *Rodríguez* v. *Srio. de Instrucción*, ante, de proteger esa discusión enérgica de las ideas, que es tan esencial para el cabal desarrollo del hombre, como para la conservación y el sostenimiento del bienestar común en una sociedad que viva en democracia.[4] Así lo reconoció el legislador puertorriqueño cuando dispuso que, en el cumplimiento de su misión, la Universidad de Puerto Rico debería "[t]ener presente que por su carácter de Universidad y por su identificación con los ideales de vida de Puerto Rico, ella está esencialmente vinculada a los valores e intereses de toda comunidad democrática".[5] 18 L.P.R.A. sec. 601, inciso b(6).

[4] Ya en *Pueblo* v. *Lastra Charriez*, 50 D.P.R. 118, 129 (1936), decíamos por voz del entonces Juez Presidente, Señor Del Toro, que "[e]l derecho a la crítica fuerte, alerta, severa, apasionada aún, no puede ser restringido. Corresponde a los ciudadanos de un pueblo libre. Es suyo y nadie puede arrebatárselo. Sobre eso no hay duda alguna".

[5] Como señala Castán por "vía de educación y reeducación, de continua promoción educativa, se podría acometer la solución del problema de los derechos

■ Con estos principios en mente podemos entender con claridad cómo es afín con la esencia vital de la universidad la norma constitucional que reconocimos en *Rodríguez* v. *Srio. de Instrucción*, ante, a los efectos de que estudiantes y profesores conservan sus derechos de expresión y asociación pacífica en consonancia con los propósitos de la institución, cuando entran a los centros de enseñanza. C. A. Wright, *The Constitution on the Campus*, 22 Vand. L. Rev. 1027 *et seq.* (1969). Más aún, se entiende también que es armónica con la filosofía de libertad, que es germen de la universidad, el principio fundamental que postula que la censura previa de los derechos de expresión y asociación se enfrenta al escrutinio judicial cargando un pesado factor que aboga en contra de su subsistencia. *Aponte Martínez* v. *Lugo*, 100 D.P.R. 282, 289 *et seq.* (1971). Hemos requerido que las autoridades "muestren los hechos que razonablemente las han llevado a concluir que de permitir la actividad proscrita, se alterarían substancialmente o se causaría una seria intervención con las actividades docentes". *Rodríguez*, supra, pág. 257. Hemos exigido que se demuestre que "las restricciones impuestas obedecen a la necesidad real de defender la eficiencia e integridad del servicio público".(6) *Rodríguez*, supra, págs. 257–258.

Este criterio, sin embargo, es definitivamente el acogido por el Reglamento General de Estudiantes de la Universidad de Puerto Rico, en su Art. 3, Sec. C(k), que luego de reconocer con precisión los derechos de expresión y asocia-

---

humanos, en relación —esto es importante y capital— con el total problema del hombre, en su naturaleza de siempre y en su esencia ética, *pero sin olvidar, a la vez, las exigencias y aspiraciones sociales de nuestro momento histórico"*. (Énfasis nuestro.) J. Castán Tobeñas, *Los derechos del hombre*, 2da ed., Madrid, Ed. Reus, 1976, pág. 180.

(6) Los más modernos diseños constitucionales del orbe mantienen este principio. La Constitución española de 1978, por ejemplo, dispone en su Art. 16: "Se garantiza la libertad ideológica, religiosa y de culto de los individuos y las comunidades *sin más limitación, en sus manifestaciones, que la necesaria para el mantenimiento del orden público protegido por la ley."* (Énfasis suplido.) Boletín oficial del Estado, *Constitución Española*, Madrid, 1979, pág. 25.

ción de los estudiantes universitarios, acotados como es de rigor en función de la naturaleza docente de la institución, dispone:

> ... *En caso de que exista peligro claro e inminente de que el ejercicio de los derechos que aquí se reconoce habrá de interferir sustancial y materialmente con el orden institucional,* los Rectores de los Recintos y los Directores de los Cólegios Universitarios o Regionales podrán, por resolución escrita fundada, prohibir la celebración de estas actividades en sus respectivos centros educativos. . . . (Énfasis suplido.)

Nuestra tarea se reduce entonces a determinar si, de acuerdo con los hechos de autos al momento de extenderse, existía en el Colegio de Humacao el peligro claro e inminente de que el ejercicio de los derechos estudiantiles habrían de interferir sustancial y materialmente con el orden institucional, de suerte que se justificara la intervención oficial con el libre ejercicio de tales derechos.[7]

Tengamos presente que para sostener su proceder las autoridades universitarias de Humacao invocan principalmente el hecho de que en el Recinto de Río Piedras las marchas y mítines que se llevaron a cabo redundaron en serios actos de violencia. Su fundamento radica en la experiencia sucedida en Río Piedras, pues debe advertirse que los actos vandálicos que se suscitaron en Humacao ni se originaron ni estuvieron relacionados con marchas o concentración estudiantil alguna. A estos efectos, nos es útil reconocer el análisis que se ha hecho en otras jurisdicciones sobre las circunstancias que deben coincidir para que experiencias previas de violencia se consideren índice correcto de surgimientos posteriores y, por tanto, fundamento válido para coartar derechos de expresión.

En la doctrina de derecho constitucional americano, tan similar al nuestro en aspectos que se refieren a derechos

---

[7] No tenemos que resolver si la disposición reglamentaria es siempre válida con abstracción de circunstancias de tiempo y lugar y con hechos distintos a los que consideramos en esta ocasión.

fundamentales, *R.C.A.* v. *Gobierno de la Capital*, 91 D.P.R. 416, 427 (1964), se ha considerado seria y profundamente si un trasfondo de violencia es válido para justificar una intervención de las autoridades públicas con los derechos de expresión y asociación del ciudadano. La respuesta ha sido afirmativa, considerándose, como es natural, que experiencias anteriores de actos violentos pueden poner restricciones a los derechos de ciertas personas u organizaciones de llevar a cabo mítines, marchas y reuniones, todo ello con ánimo de proteger la vida y propiedad de los ciudadanos. Véase *Judicial Control of the Riot Curfew*, 77 Yale L.J. 1560 *et seq.* (1968). No obstante, considerando las serias repercusiones que tal censura conlleva, deben coincidir varios requisitos para que esa restricción justificada con actos violentos previos sea válida. En primer lugar, la violencia debe ser lo bastante seria como para causar, bien lesiones personales de envergadura o daño sustancial a la propiedad. Además la violencia debe ocurrir en la misma área en que se pretende llevar a cabo la demostración, porque un cambio de ubicación, por lo común, rompe con el patrón de violencia y altera las variables importantes, tales como los objetivos simbólicos, las víctimas potenciales, los incitadores posibles y los escondites usuales. Más aún, la violencia debe ser lo suficientemente continua como para constituir un patrón o trasfondo verdadero y no un mero acto desafortunado del pasado. Por último, la violencia debe ser reciente. Como se dijo en *Drivers Union* v. *Meadowmoor*, 312 U.S. 287, 294 (1941), debe haber un "momentum de temor", una "intimidación continua", pág. 298. V. Blasi, *Prior Restraints on Demonstrations*, 68 Mich. L. Rev. 1481, 1520 *et seq.* (1970). Podemos resumir, que la violencia anterior que da lugar a la restricción válida del ejercicio de libertades de expresión y asociación de grupos, debe ser de sustancial magnitud y continuidad y debe ocurrir aproximadamente en el mismo lugar en que ahora se proscribe, así como en tiempo reciente.

No albergamos duda de que los sucesos acaecidos en el recinto riopedrense se distinguieron por su severa magnitud y prolongación. Durante los días 8, 9, 10 y 13 de setiembre de 1976, se llevaron a cabo en dicho recinto marchas y mítines que, tal como hemos reseñado, degeneraron en desórdenes y violencia que causaron pérdidas muy cuantiosas a la propiedad universitaria, tanto como agresiones e intimidaciones a estudiantes, profesores y administradores.[8] Ahora bien, el centro neurálgico de la controversia de autos se centra precisamente en determinar si los requisitos de proximidad física y temporal, así como de circunstancias similares, se satisfacen en el caso de autos donde los sucesos de *Río Piedras* son invocados para justificar la prohibición de actividades extracurriculares *en Humacao*. Veamos.

El Recinto Universitario de Río Piedras radica en el Area Metropolitana de San Juan, que es el centro urbano más extenso del país. Es una entidad universitaria muy grande en todo sentido. Ocupa un área de alrededor de 280 cuerdas de terreno. Para el año lectivo 1976–1977, en el cual ocurrieron los hechos que motivan la controversia de autos, contaba con instalaciones físicas cuya superficie ascendía a aproximadamente 2,533,714 pies cuadrados. Contaba entonces con 1,420 profesores a cargo de las tareas docentes. Por otra parte, 2,402 personas tenían a su cargo las labores de administración y otros servicios. Conviene señalar, por último, el importante hecho de que en aquel entonces su matrícula ascendía a 24,216 estudiantes. I. Rodríguez Bou, Rector, *Informe Anual 1976–77*, pág. 5 *et seq.* y Apéndice V.

El Colegio de Humacao, sin embargo, presentaba para la fecha de la ocurrencia de los hechos de autos un cuadro totalmente distinto. Era un recinto universitario pequeño con características en todo sentido disímiles al recinto riopedrense. Así, por ejemplo, advertimos que el Colegio

---

[8] Así quedó probado ante el Tribunal Superior de San Juan en el caso PE-76-1250(907), obrando en autos copia de la sentencia dictada.

radica en un predio de 63 cuerdas de las cuales sólo se utilizan 48. Colegio Universitario de Humacao, *Informe para Plan de Desarrollo Integral*, Humacao, 1979, pág. 71. Contaba en los momentos pertinentes con un reducido número de estructuras cuya superficie útil llegaba sólo a 143,458 pies cuadrados. Universidad de Puerto Rico, Administración Central, Oficina de Planificación y Desarrollo, *Inventario de la Planta Física de la U.P.R.*, Río Piedras, 1977, pág. 19. Finalmente, debemos puntualizar con énfasis que durante el año académico 1976–1977 la institución humacaeña contaba con 159 profesores para atender la enseñanza de sólo 3,233. [9] *Informe para describir la gestión realizada por la Administración del Colegio Universitario de Humacao, durante el período comprendido entre febrero de 1976 y junio de 1978*, págs. 17 y 14, 30 de junio de 1978.

Considerando los criterios antes reseñados a la luz de este contraste, no podemos concluir que las experiencias de violencia que se registraron en Río Piedras son base suficiente para restringir absolutamente los derechos de expresión y asociación de los estudiantes de Humacao, por representar un peligro claro e inminente de violencia en el recinto humacaeño. Aun olvidando que ninguno de los actos ilegales que ocurrieron en Humacao respondió, como en Río Piedras, a actividad estudiantil alguna y, más aún, ignorando la considerable distancia que separa a ambas instituciones, las circunstancias de uno y otro centro difieren tanto que no alcanzamos a percibir paralelismo alguno entre ambos, que sirva para sostener la proscripción impuesta por el señor Director. El ambiente distinto que circunda al Recinto de Humacao, [10] su población estudiantil tan signi-

---

[9] La población estudiantil del Colegio de Humacao era así una octava parte de aquella que se agrupaba en Río Piedras, la cual era superior por más de 20,000 estudiantes.

[10] De acuerdo con el censo de la población de 1970, el área metropolitana de San Juan, donde radica el Recinto de Río Piedras, contaba con 851,247 habitantes. Contrasta grandemente con esta impresionante cifra el hecho de que, para la misma fecha, en el municipio de Humacao residían 36,023 personas. Bureau of the Census, *1970 Census of Population*, págs. P.R. 53–181 y 184.

ficativamente menor, su *campus* reducido y su limitado número de estructuras nos obligan a concluir que las variables pertinentes se alteran tan destacadamente cuando nos movemos de Río Piedras a Humacao, que la violencia que se advirtió en el recinto metropolitano no libera a la censura previa que se impuso en Humacao, de la pesada presunción de inconstitucionalidad con que este tipo de medidas se presenta ante el escrutinio judicial.[11]

Más aún, al momento de decretarse en Humacao el segundo vedamiento el 18 de octubre de 1976, por cuya violación se acusó a los recurridos, había transcurrido más de un mes desde que cesaron los actos de violencia en Río Piedras y desde que el recinto riopedrense había sido cerrado. Tampoco se advierte proximidad temporal entre los sucesos violentos advertidos y la prohibición de actividades extracurriculares en Humacao. Reafirma nuestra conclusión el hecho relevante de que durante los diez días que transcurrieron luego de vencer la primera prohibición y antes de decretarse la segunda —del 8 al 18 de octubre— en el Colegio de Humacao no se registró acto de violencia de ninguna clase como consecuencia de forma alguna de expresión estudiantil.

A la luz de estas consideraciones coincidimos con el ilustrado tribunal sentenciador en aquella parte de su sentencia que declaró constitucionalmente impermisible la censura impuesta sobre los derechos de expresión y asociación de los

---

[11] Al hacer la Junta de Disciplina sus recomendaciones en torno al caso el Profesor José Malavé López, representante del Claustro ante dicha Junta, suscribió una opinión disidente, la que expresa lo siguiente en relación con la actividad en que participaron los recurridos: "Considero que dicha actividad violaba la orden emitida por el Director el 8 de septiembre de 1976 amparándose en dicho artículo 3C(3)(k). Sin embargo, entiendo que no existía[n] en el Colegio las condiciones que se establecen en dicho artículo y que facultan al Director para ponerlo en vigor. Es bueno señalar que el mismo Presidente de la Universidad de Puerto Rico, Dr. Arturo Morales Carrión, manifestó en varias ocasiones, en declaraciones públicas durante el tiempo en que estuvo en vigor la orden del señor Director, que a excepción del Recinto de Río Piedras la situación en el resto del sistema universitario era de completa normalidad."

estudiantes de Humacao y, en consecuencia, inválidas las sanciones impuestas por su violación.

■ Ahora bien, conviene aclarar sobre este punto, que nuestra posición dista mucho de ser un llamado a favor de la permisibilidad de actos violentos en las universidades públicas. Como advirtiera el Juez Fortas, la tolerancia de la violencia conlleva la erosión misma de los fundamentos de una sociedad ordenada. A. Fortas, *Concerning Dissent and Civil Disobedience*, New York, Signet Books, 1968, pág. 93. En este sentido, las autoridades universitarias tienen, como corolario de su obligación de proteger la propiedad universitaria y la persona de los universitarios, plena facultad para adoptar las medidas que sean necesarias para proteger la paz institucional. Ya en *Tinker* v. *Des Moines School Dist.*, 393 U.S. 503, 513 (1969), el Tribunal Supremo federal había reconocido las actividades estudiantiles no protegidas al declarar: "Pero la conducta del estudiante, en clase o fuera de ella, que por cualquier razón —bien surja ésta de tiempo, lugar o tipo de comportamiento— causa interrupción sustancial o envuelve desorden sustancial o invasión de los derechos de otros, claramente no está inmunizada por las garantías constitucionales de libertad de expresión." Debe tenerse en cuenta, sin embargo, que nuestra Constitución requiere que el rigor de las medidas tomadas se ajuste a las circunstancias de cada caso, debiendo evitarse que las medidas de seguridad sean tan drásticas que lesionen innecesariamente los derechos en ella consagrados. Véase, *Tinker*, ante, pág. 508.

## II

Cuanto hemos discutido dispone de la sanción que se le impuso a los estudiantes recurridos por violación al inciso C3(k) del Reglamento, sanción que respondía a su desatención a la censura impuesta por el señor Director del Colegio Universitario de Humacao.

Ahora bien, discrepamos del tribunal a quo en su con-

clusión, a los efectos de que la invalidación de la rigurosa censura que se impuso en Humacao disponía también de la sanción impuesta a los recurridos por violar el apartado *h* del mismo inciso C3 que prohíbe la utilización de altoparlantes sin mediar autorización previa y escrita del Director, a tenor con las normas que éste establezca. El Tribunal Superior expuso que "sería ingenuo pensar que el permiso se hubiese concedido mientras la moratoria estaba en vigor. En vista de ello, no se puede penalizar a los demandantes por no haber tomado los pasos para solicitarlo, acto que a todas luces hubiese sido estéril. Durante la moratoria la prohibición de este inciso se convirtió en absoluto [*sic*], y su validez se cae junto con la validez de la moratoria. No puede por tanto sancionarse a los demandantes por haber violado este inciso". El razonamiento es incorrecto, pues lo procedente es señalar que, como veremos, el uso de altoparlantes en el lugar donde fueron utilizados por los recurridos estaba prohibido, no obstante la imposición de la censura.

Sucede, que, a tenor con la autoridad que le confiere el Reglamento de Estudiantes, el señor Director del Colegio de Humacao promulgó el 8 de julio de 1976 las siguientes normas con relación al uso de altavoces:

> Se permitirá el uso de altoparlantes, bocinas y cualesquiera otros instrumentos de amplificación de sonido, previa autorización escrita del Ayudante del Director a/c Asuntos Estudiantiles del Colegio Universitario de Humacao, en el área que a continuación se designa:

> El terreno que colinda con las canchas de baloncesto, por el este, la acera que conduce a dichas canchas, por el norte, y la carretera que conduce al estacionamiento que se encuentra detrás del edificio de Letras al oeste, excluyendo una franja de terreno de 100 pies bordeando los límites de dicha área interior medidas desde el borde de las diferentes colindancias. Este terreno está debidamente identificado.

> Se prohibe el uso de altoparlantes, bocinas y otros instrumentos de amplificación del sonido en cualquier otra área, fuera de la especificada anteriormente . . . .

■ La razonabilidad de la norma establecida por el señor Director del Colegio Universitario de Humacao no ha sido cuestionada y comoquiera que está resuelto que es procedente la regulación razonable del uso de altoparlantes —*Mari Bras* v. *Casañas*, 96 D.P.R. 15 (1968); *Sucn. de Victoria* v. *Iglesia Pentecostal*, 102 D.P.R. 20 (1974)— debemos considerarla válida para propósitos de nuestro análisis.[12] En ese sentido, si los estudiantes hubiesen utilizado los altoparlantes en las áreas que, mediando el debido permiso, han sido dispuestas para ello por la reglamentación del señor Director, sería prudente considerar la proposición del tribunal sentenciador a los efectos de que la solicitud de permiso era fútil, considerando los términos absolutos de la censura que se imponía. Mas, lo que sucede en el caso de autos es que los recurridos utilizaron los altavoces en el lugar en que, por su cercanía a los lugares de trabajo del Colegio, su uso estaba prohibido *siempre*, mediara o no censura especial y donde el Ayudante del Director a cargo de Asuntos Estudiantiles no podía conceder válidamente el permiso sin contravenir la delegación que le hiciera el Director. La vigencia de la censura no era, pues, impedimento válido para que los estudiantes recurridos fueran considerados incursos en violación a la disposición reglamentaria que prohíbe el uso de altoparlantes sin autorización y, en forma hostil, a las normas establecidas por el señor Director del Colegio porque, sobre toda otra consideración, resalta el hecho escueto de que los recurridos utilizaron altavoces en abierto desafío a las normas adoptadas a los efectos por las autoridades del Colegio, sin controvertir la razonabilidad de dichas normas. En este aspecto, le asiste la razón a la parte recurrente y debe modificarse la sentencia recurrida.

---

[12] Por ejemplo, no se ha invocado que en el momento en que se hizo uso de los altoparlantes hubiese habido receso oficial en las actividades académicas en el lugar utilizado ni ninguna otra circunstancia que demostrara la irrazonabilidad de la veda absoluta en dicha ocasión.

## III

Pasemos entonces a resolver la última cuestión que se plantea en el recurso y que trata sobre la facultad del Director recurrente para prohibir a los estudiantes la entrada al recinto universitario.

El Reglamento General de Estudiantes de la Universidad de Puerto Rico, vigente en la fecha de los hechos, en su Art. 16 B, faculta al Rector o Director de un Colegio Universitario o Regional a acudir al foro judicial en los casos señalados. Así dispone lo siguiente en cuanto a estudiantes y/o personas ajenas a la institución:

> El Rector, el Director de un Colegio Universitario o Regional o de alguna facilidad de la Universidad, cuando tuviere motivos fundados para creer que la continuada presencia de algún estudiante o grupos de estudiantes de la Institución y/o personas ajenas a la Institución impide la celebración pacífica de las clases y otras actividades oficiales o constituye un peligro claro e inminente a la seguridad de personas o propiedad dentro del mismo, podrá radicar, a nombre de la Universidad de Puerto Rico, una petición de Interdicto (Injunction) ante cualquier Sala de [*sic*] Tribunal Superior de Puerto Rico para impedir la entrada de este estudiante o grupo de estudiantes a las facilidades de la Universidad.

Por otro lado, el Art. 11 del mismo Reglamento enumera las sanciones que pueden imponerse a los estudiantes que actúen en contravención de las normas disciplinarias de la Institución, a saber:

> Las violaciones a las reglas que anteceden pueden conllevar la adopción de algunas de las medidas siguientes:
>
> 1. Amonestación.
>
> 2. Probatoria por un tiempo definido durante el cual otra violación de cualquier norma tendrá consecuencia de suspensión o separación.
>
> 3. Suspensión de la Universidad por un tiempo definido. La violación de los términos de la suspensión conllevará un

aumento del período de suspensión o la separación definitiva de la Universidad.

4. Separación definitiva de la Universidad.

5. Los actos que constituyan violaciones a este Reglamento y que ocasionen daños a la propiedad podrán conllevar como sanción el compensar a la Universidad los gastos en que incurra para reparar estos daños.

6. Cualquier otra sanción *que se especifique* en el Reglamento de Estudiantes del Recinto, Colegio Universitario o Colegio Regional correspondiente.

■ La controversia planteada es si puede prohibirse la entrada al recinto a un estudiante que haya violado las normas disciplinarias hasta el extremo de conllevar una suspensión por un tiempo definido o una separación definitiva, sin tener que recurrir las autoridades universitarias a la esfera judicial. Parece implícito en la facultad de suspender, la de prohibir la entrada al recinto, considerando la seriedad de la violación incurrida por el estudiante, que justifique la suspensión. Nótese que la suspensión es el paso reglamentario que le sigue a la probatoria. No podemos suponer que por no estar expresamente contenida en el reglamento la facultad de prohibir, le está vedado a las autoridades universitarias en circunstancias difíciles de disciplina con las que no puedan lidiar de momento, el que quede trunca su facultad reglamentaria de suspensión. De insistir el suspendido en tener acceso al recinto, entonces, las autoridades universitarias podrán invocar el Art. 11 del Reglamento, el cual está disponible además contra personas ajenas a la institución.

Por ello, concluimos que es válida la sanción impuesta a los recurridos por el señor Director del Colegio de Humacao, con la cual les prohibía que se adentraran en cualquier dependencia de la Universidad.

■ No podemos dejar consignado que, según han señalado los estudiosos de la materia, la intervención de los tri-

bunales en casos en que media gran tensión entre estudiantes universitarios y los administradores de la institución puede ser una fuerza positiva y conducente a la solución pacífica de las disputas. R. R. Rosenthal, *Injunctive Relief Against Campus Disorders*, 118 U.Pa. L. Rev. 746 *et seq.* (1970). Lo ideal, sin embargo, sería que las disputas se solucionaran mediante el uso pacífico del diálogo, en el que reine la cordura y la sensatez de las partes, o algún procedimiento de arbitraje que hiciera posible tomar acuerdos sin intervención judicial.

## IV

Resulta de todo lo anterior, que el señor Director del Colegio Universitario de Humacao actuó correctamente al determinar que los estudiantes recurridos violaron la disposición reglamentaria referente al uso de altoparlantes, en contravención a las normas dispuestas a los efectos, inciso C3(h), así como aquella disposición del Reglamento de Estudiantes que prohíbe la celebración de marchas y mítines cerca de los edificios donde se llevan a cabo tareas lectivas, inciso C3(j).

Ahora bien, al modificar la sentencia recurrida para dejar sin efecto la disposición que hiciera el tribunal sentenciador con respecto al inciso C3(h) y sostener la validez de la determinación del recurrente, nos restaría entonces pasar juicio sobre la evaluación que hiciera la sala de instancia en torno a la adecuacidad del castigo impuesto al modificar las determinaciones que a los efectos hiciera el Director del Colegio de Humacao. En ese sentido, dado que la actuación del tribunal a quo no fue irrazonable y que la prolongada tramitación de este caso debe concluir, resolvemos que procede confirmar las actuaciones del Tribunal Superior a los efectos. Debemos señalar, sin embargo, que los tribunales deben abstenerse de intervenir con la discreción de las autoridades universitarias en torno al rigor de las medidas disciplinarias. En casos como el de autos,

donde se determina que las bases que sostienen los castigos son parcialmente inválidas, lo apropiado sería remitir el caso a las autoridades universitarias para que, dentro de un plazo razonable, procedieren a imponer las sanciones que estimaren prudentes, las que, salvo exceso manifiesto, deben ser objeto de gran deferencia ante el tribunal. *Rodríguez* v. *Srio. de Instrucción*, supra.

*A tenor con los fundamentos anteriores se dictará sentencia que deje sin efecto aquella parte de la sentencia recurrida que declaró inválida la prohibición impuesta al recurrido Esaúl Sánchez Carambot de entrar a los terrenos, dependencias y facilidades bajo el control de la Universidad y aquella que ordenó al recurrente, Dr. Federico M. Matheu, a eliminar del expediente permanente de los recurridos Esaúl Sánchez Carambot y Roberto Ortiz Feliciano la referencia a la violación del inciso C3(h) (referente al uso de altoparlantes) del Reglamento General de Estudiantes de la Universidad de Puerto Rico. Así modificada, se confirmará.*

El Juez Presidente Señor Trías Monge concurre en la parte I de la opinión. Disiente de las partes II y III y la porción de la IV en que se alteran las conclusiones del tribunal de instancia. El Juez Asociado Señor Díaz Cruz emitió voto disidente.

—O—

Voto disidente del Juez Asociado Señor Díaz Cruz.

No puedo unirme a la laxitud que en gran medida ha determinado la ausencia de disciplina en nuestro medio, que va desde el inocuo mitin que a nadie molestó hasta los enormes agravios a la paz y la seguridad que ya son rutina y "riesgo calculado".

La opinión se enajena de la realidad, y como *Rodríguez* v. *Srio. Instrucción*,[1] 109 D.P.R. 251 (1979), que reitera,

---

[1] Después de esta licencia a los sindicalistas y agitadores obreros para invadir la escuela, los políticos lamentablemente la interpretaron como igual auto-

barre bajo la alfombra el derecho a la educación que nuestra Constitución de 1952 afirma en su Art. II, Sec. 5, y que suscita la confrontación crítica, entre ese derecho que propende al desarrollo de la personalidad "y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales" y de otra parte el derecho de libre expresión que en el Recinto de Humacao tomó la forma de lanzamiento de una cadena de metal sobre los conductores de energía eléctrica del recinto, el desbordamiento de inodoros en varios edificios, inclusive la biblioteca y el forzado desalojo de salones de clase insertando agentes químicos apestosos en las unidades de aire acondicionado.

El per curiam descansa en premisas erróneas al interpretar el Reglamento General de Estudiantes en su parte prohibitiva de actividades extracurriculares cuando exista *peligro claro e inminente* de que el ejercicio peculiar de la libre expresión y asociación plantee un riesgo para el orden institucional; toma como base para negar relación causal o de "trasfondo" —experiencia previa de violencia— entre los actos vandálicos realizados en Río Piedras y los que tuvieron lugar en Humacao: (a) que el Recinto de Río Piedras para entonces tenía más de 24,000 estudiantes y el Colegio Regional sólo 3,233. Olvida que las explosiones de violencia, justificadas o no, se han producido históricamente con entera abstracción del número de habitantes en el país o lugar afectado; (b) que la conducta incivil de los recurridos no tenía raíces o motivación en lo ocurrido en Río Piedras, porque cuando se deciden a "manifestarse" ya hacía *un mes* que la violencia ríopedrense había obligado a cerrar la Universidad; ¿acaso tienen que ser simultáneos los brotes de violencia e indisciplina para que pueda percibirse la motivación común, o el llamado trasfondo, y llegar a la conclusión de que existe "peligro claro e inminente" de que los

---

rización para actividad partidista y se usaron estudiantes de Escuela Superior en el propio local docente, para llenar las peticiones de nominación exigidas a candidatos a puestos electivos en las elecciones generales de noviembre de 1980.

actos de los infractores ponen en riesgo el orden y la paz institucional?; no ofrece la opinión ningún otro motivo, contra la conocida realidad de que los movimientos del Recinto mayor de Río Piedras tienen siempre repercusión, de mayor o menor intensidad, en los demás recintos; y añade (c) que "la considerable distancia" entre Río Piedras y Humacao produce algo como efecto inmunizante en los humacaeños. Este criterio choca hasta con la facilidad con que residentes de Humacao vienen diariamente a cumplir su horario de trabajo en la zona metropolitana. Puerto Rico, en su limitado territorio nacional es un solo *campus* por el que se han extendido, en recintos dispersos a través de la Isla con entera viabilidad, tanto la Universidad de Puerto Rico como las privadas.

El criterio de decisión es ambiguo y ambivalente; es débil, en lugar de benigno, con uno de los recurridos que ya anteriormente había violado una probatoria, pero se sobrecoge con los criterios adversos de *Tinker* v. *Des Moines School Dist.*, 393 U.S. 503 (1969) y del Juez Fortas en *Concerning Dissent and Civil Desobedience*, New York, Signet Books, 1968, pág. 93; postula una juiciosa abstención de los tribunales en los asuntos universitarios, y al momento de decidir desplaza totalmente la competencia académica.

En fin, considero que no se justifica la intromisión de los tribunales en el presente caso para decirle a las autoridades universitarias que han errado en la apreciación de indicios en que pueden descansar para proteger la paz del recinto y la función educativa de un "peligro claro e inminente". Los derechos constitucionales deben ser rigurosamente resguardados, pero no prodigados.

El Tribunal, con muchos menos recursos estimativos que la dirección universitaria levantó una muralla entre el mitin relativamente ordenado y la conducta escatológica y violenta que amenazaba con un desarrollo similar al del Recinto de Río Piedras. Este método de penosa disección de la masa de eventos antisociales nubla la capacidad para

apreciar en forma integral el potencial destructivo de cada uno de los factores envueltos en la violencia en el *campus*. Jefferson nunca pensó que la libertad de expresión acogería bajo su palio los eventos acaecidos en el *campus* de Humacao y que movieron a la Dirección a tomar una leve medida preventiva. El *ratio decidendi* sugiere, en su condenación de la prevención —que llama restricción previa— la inacción de las autoridades académicas hasta que empiecen a escucharse los disparos y a volar las "molotofs". El Director del Colegio Universitario de Humacao, universitario inmerso en el estilo de vida del *campus*, está en mejor posición para advertir y conjurar el daño al recinto. Ubicado en el ojo de la tormenta está en superior plano para percibir los relieves y perfiles de la conducta disolvente de la libertad auténtica. En el cuadro general de hechos de este caso, ni el Reglamento ni la decisión administrativa, lesionan derechos individuales en desproporción con la medida disciplinaria cautelar necesaria para proteger los mayores intereses de la educación que garantiza nuestra Constitución.

Revocaría la sentencia recurrida y desestimaría la demanda.