Félix F. Rodríguez, etc., et al., demandantes y recurridos, *v.* Dr. Ramón A. Cruz, Secretario de Instrucción Pública de Puerto Rico, etc., demandados y recurrentes.

*Número:* R-76-237 *Resuelto:* 27 de noviembre de 1979

*Miriam Naveira de Rodón* y *Héctor A. Colón Cruz, Procuradores Generales, Mario N. Paniagua* y *Justo Gorbea Varona, Procuradores Generales Auxiliares*, abogados de la parte recurrente; *Roberto Busó Aboy*, abogado de la parte recurrida.

El Juez Asociado Señor Martín emitió la opinión del Tribunal.

El presente recurso nos conduce a examinar la validez constitucional de la reglamentación que el codemandado, Secretario de Instrucción Pública de Puerto Rico, ha adoptado para regir las actividades de reclutamiento de socios como la que lleva a cabo en las escuelas públicas del país la demandante, Federación de Maestros de Puerto Rico.([1])

Los hechos son los siguientes. La Federación de Maestros es una entidad que agrupa profesores del sistema de instrucción pública, para lo cual está autorizada por el Secretario de Trabajo de Puerto Rico. Con el fin de promover su matrícula, solicitó del Departamento de Instrucción que le permitiera a sus organizadores acudir a los planteles escolares durante la hora del almuerzo para reunirse allí con los maestros y persuadirles a ingresar en la colectividad. Los oficiales del Departamento de Instrucción se negaron a conceder el permiso atendiendo a las normas establecidas por el Secretario de Instrucción Pública mediante dos memoranda circulados al efecto,([2]) en los que disponía que la labor de

---

([1])La Federación está organizada bajo la Ley Núm. 134 del 19 de julio de 1960, 3 L.P.R.A. sec. 702.

([2])Tienen los mismos fecha de 13 de septiembre y 11 de diciembre de 1973, respectivamente.

reclutamiento sólo se permitiría "fuera de las horas regulares de trabajo y de tal modo que no interrumpa las funciones normales de la escuela"; aclarándose que las horas regulares de trabajo incluían los períodos de trabajo por equipo. Las frases citadas precedentemente fueron luego interpretadas por el Secretario mediante comunicaciones(3) dirigidas al demandante Félix F. Rodríguez al efecto de que "[l]a hora del almuerzo forma parte del programa escolar, ya que durante la misma se realizan algunas tareas relacionadas con la función docente."

La reglamentación del Secretario exige que el horario regular de enseñanza se dedique única y exclusivamente a actividades educativas y docentes. Además, provee que el horario escolar ordinario comienza una hora antes de iniciarse la labor escolar y concluye una hora después de terminar ésta, cubriendo las etapas de clase, almuerzo, biblioteca y otros períodos no lectivos. La Federación sostiene que no es su intención el causar problemas administrativos a las autoridades escolares, y que por el contrario avisaría con antelación las fechas de las visitas de sus organizadores a los planteles escolares. Sostiene, además, que las normas adoptadas por el Secretario de Instrucción impiden que la Federación y sus miembros se reúnan para dialogar con los maestros de las diferentes escuelas públicas durante la hora de almuerzo, en que dichos maestros están libres de su labor docente. Por ende, entiende que la reglamentación adoptada es irrazonable y por tanto atenta contra los derechos de libre expresión y asociación garantizados por las secciones primera, cuarta, sexta y séptima de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico, razón por la cual acudió ante el tribunal de instancia en demanda de *injunction* contra el Secretario de Instrucción suplicando que se le ordenara a éste permitir a los organizadores de la Federación de Maestros a entrar a las escuelas públicas durante la hora

---

(3)Cartas de 23 de septiembre de 1974 y 21 de octubre de 1975.

de almuerzo para comunicarse con los maestros en gestiones conducentes a reclutar miembros para la Federación.

El Tribunal Superior acogió el planteamiento de la demandante y dictó el interdicto solicitado. El Secretario acudió en alzada ante nos.

I

Hemos señalado que los oficiales de la Federación de Maestros desean reunirse con los profesores de las escuelas públicas en los planteles escolares en la hora de almuerzo. Durante ese tiempo los maestros se encuentran fuera de sus actividades de enseñanza, excepto que hay planteles donde suelen turnarse los profesores para vigilar en el comedor escolar. Aun así los directores del Departamento de Instrucción entienden que no procede permitir las reuniones, justificando su negativa en su propósito de evitar que los alumnos se sometan al fragor de campañas sindicales, de reducir la posibilidad de brotes de desorden o de violencia entre partidarios de entidades rivales, y por razón de que es deseable fomentar el que los miembros.de la facultad estén disponibles para el estudiantado durante la hora de almuerzo "aunque sólo sea para confraternizar." Como alternativa, las autoridades escolares ofrecen a la Federación el uso de los tablones de edictos y los buzones de correspondencia de cada maestro para ser utilizados en la comunicación con éstos.[4] La Federación por su parte, en ánimo de evitar que sus visitas redunden en inconvenientes administrativos, está dispuesta a notificar con antelación a los directores escolares su intención de visitar la escuela, de manera que puedan tomarse las medidas de rigor.

Resalta pues en el caso de autos un conflicto entre dos legítimos intereses sociales, los cuales son, la necesidad de proteger el derecho ciudadano de expresión y asociación, y el

[4]No obstante, quedó probado ante el tribunal sentenciador que los directores de la Federación no tienen garantía alguna de que el material que se le entregue al director del plantel llegaría finalmente a colocarse en los tablones.

deber de mantener en las aulas escolares el clima de paz y sosiego que se requiere para el aprendizaje.(5) Ahora bien, nuestro sistema constitucional, como veremos, provee el balance entre los intereses encontrados.

## II

La sección cuarta de la Carta de Derechos de nuestra Constitución(6) consagra la prerrogativa de los individuos de expresarse libremente. Como corolario del derecho de expresión, la sección sexta del mismo cuerpo reconoce el derecho de las personas a asociarse y organizarse para cualquier fin lícito con igual libertad.(7) Ambos derechos son fundamentales para la consecución y ejercicio de la libertad de conciencia lo que nos obliga a su más celosa protección. *Diario de Sesiones de la Convención Constituyente*, Vol. 4, pág. 2564.(8) A pesar de la honda estima social de que disfrutan tales postulados ello no los hace acreedores de irrestricción absoluta, sino que por el contrario han de subordinarse a otros intereses en circunstancias en que la conveniencia y necesidad pública así lo requieran. *Mari Bras* v. *Casañas*, 96 D.P.R. 15, 21 (1968). Los tribunales deben pues, sopesar el alcance de la restricción a la libre expresión y

(5)*Procunier* v. *Martínez*, 416 U.S. 396, 409-410 (1973).

(6)Constitución del Estado Libre Asociado de Puerto Rico, Art. II, Sec. 4.

(7)También la Constitución de los Estados Unidos, por medio de sus enmiendas primera y decimocuarta protege en Puerto Rico los derechos de expresión y asociación. *Aponte Martínez* v. *Lugo*, 100 D.P.R. 282, 287 (1971). No obstante, la extensión en que los tutela nuestra Constitución no es menor que la extensión en que los garantiza aquélla. *R.C.A.* v. *Gobierno de la Capital*, 91 D.P.R. 416, 427 (1964). Basta entonces con referirnos a la nuestra.

(8)En los Estados Unidos de América distinguidos juristas han señalado que es improcedente conceder énfasis particular a la garantía de expresión. Ver por ejemplo la opinión del Juez Frankfurter en *Kovacs* v. *Cooper*, 336 U.S. 77 (1949) y Learned Hand, *The Spirit of Liberty*, New York, 1953, págs. 201-208. Otros entienden que el privilegio concedido a la primera enmienda es todavía muy modesto. Véanse H. L. Black, *The Bill of Rights*, 35 N.Y.U.L. Rev. 865-871 (1960) y Cahn, *Justice Black and First Amendment Absolutes: A Public Interview*, 37 N.Y.U.L. Rev. 549-563 (1962). La jurisprudencia, por su parte, intenta un balance de posiciones justipreciando intereses.

asociación y la importancia del interés gubernamental que anima la restricción, a la luz de la amenaza que la conducta impedida representa para tal interés del Estado. Deben considerarse las alternativas que tiene el poder guberna- mental para alcanzar el objetivo de su limitación de la manera que menos lesione el derecho de expresión; y consi- derarse además las alternativas que tiene disponibles la persona para el ejercicio de su libertad de expresión y de asociación sin afectar adversamente las pretensiones guberna- mentales. El principio rector del conflicto entre los derechos señalados puede resumirse expresando que a mayor limitación al derecho de expresión, mayor debe ser el interés estatal que requiere protección[9] y mayor la lesión a ese interés.

Demás está decir que hay lugares que resultan impropios para ejercitar algunos modos de expresión.[10] Los tribunales, los hospitales, los templos y las escuelas son algunos de esos sitios. Así reconocimos en *E.L.A.* v. *Herman- dad de Empleados*, 104 D.P.R. 436, 443–444 (1975), al adoptar expresiones del Juez Hugo L. Black en *Gregory* v. *City of Chicago*, 394 U.S. 111 (1964), que nada impide al Estado mantener las escuelas y otros lugares similares libres del bullicio propio de la política y de los negocios, protegiendo así el sosiego que en ellas debe prevalecer.[11] En contraste con los parques, plazas y calles, considerados tradicionalmente foros por excelencia de expresión pública, las escuelas y bibliotecas estatales no se organizaron para celebrar en ellas

---

[9]Véanse *United States* v. *O'Brien*, 391 U.S. 367, 376–377 (1968); *Thomas* v. *Collins*, 323 U.S. 516, 530 (1944).

[10]Véanse entre muchos otros *Shenck* v. *United States*, 249 U.S. 47, 52 (1919); *Grayned* v. *City of Rockford*, 408 U.S. 104 (1972); *Adderley* v. *State of Florida*, 385 U.S. 39 (1966) y Kalven, *The Concept of the Public Forum: Cox* v. *La.*, 1965 Sup. Ct. Rev. 1.

[11]Empero, es preciso distinguir con claridad entre el bullicio que impide la consecución de un clima propio para la enseñanza, y la discusión enérgica de las ideas, esencias para la formación intelectual del hombre. *Shelton* v. *Tucker*, 364 U.S. 479, 487 (1960).

libre intercambio comunitario. Tienen pues la naturaleza de foros semipúblicos. En instituciones de esa índole el Estado disfruta del derecho de mantener la tranquilidad requerida para llevar a cabo el principal cometido asignádole. Pero, por otro lado, como bien señala el Profesor Tribe, el Estado carece de facultad para excluir de dichas instituciones la expresión o asociación pacífica que sea compatible con su gestión. L. H. Tribe, *American Constitutional Law*, Mineola, N.Y., 1978, pág. 690.

Concretando en los hechos del caso de autos a la luz del principio rector que permite la libre expresión y asociación en los planteles escolares limitado por los fines para los cuales existen, no hemos podido encontrar en el récord evidencia que nos conduzca a pensar que las visitas de los miembros de la Federación a los planteles escolares con fines organizativos habrán de redundar en menoscabo al orden que debe imperar en tales centros de enseñanza. En ausencia de tal prueba la absoluta proscripción que impone el Secretario no debe subsistir.

 Los derechos básicos garantizados por nuestra Constitución acompañan tanto a maestros como a estudiantes durante su permanencia en los predios escolares.([12]) La prohibición de su ejercicio tiene pues que obedecer a motivos que trasciendan del mero deseo de evitar inconvenientes triviales.([13]) Por ello, se requiere de las autoridades escolares que muestren los hechos que razonablemente las han llevado a concluir que de permitir la actividad proscrita, se alterarían substancialmente o se causaría una seria intervención con las actividades docentes. Concretamente, debe demostrarse que las restricciones impuestas responden a la necesidad real de

([12])Véanse *Pickering* v. *Board of Education*, 391 U.S. 563 (1968); *Tinker* v. *Des Moines School Dist.*, 393 U.S. 503, 506 *et seq.* (1969); *Goss* v. *Lopez*, 419 U.S. 565, 574 (1975).

([13])Recientemente el Tribunal Supremo de los Estados Unidos ha protegido derechos de profesores en distintas áreas. Véanse entre otros *Keyishian* v. *Board of Regents*, 385 U.S. 589 (1967); *Shelton* v. *Tucker*, 364 U.S. 479 (1960).

defender la eficiencia e integridad del servicio público.[14] No es suficiente sentir un temor infundado al bullicio sindical o el deseo de que todos los maestros compartan con los estudiantes durante las horas de almuerzo de todos y cada uno de los días escolares, para sostener prohibición tan estricta como la que plantea el caso de autos, que tiene el efecto de limitar al escueto tablón de edictos toda comunicación entre la demandante y los profesores. Véase *Teachers' Freedom of Expression Outside the Classrom: An Analysis of the Application of Pickering and Tinker*, 8 Ga. L. Rev. 900, 907 *et seq.* (1974).

## III

El deseo de mantener un ambiente de paz, orden y camaradería que persigen las autoridades escolares, legítimo como es, puede adelantarse de manera menos lesiva a la libertad de expresión y asociación de los maestros.[15]

Ahora bien, cuando se enfrentan los tribunales a medidas que, como en el caso de autos, se relacionan con la función escolar, su proceder ha de ser particularmente cuidadoso. El peligro que puede acarrear una actitud distinta ha sido reiteradamente expresado judicialmente y en pronunciamientos doctrinales. Véanse Black en *Tinker* v. *Des Moines School Dist.*, 393 U.S. 503, 515 (1969); T. Harvie Wilkinson III, *Goss* v. *Lopez: The Supreme Court as School Superintendent*, 1975 Sup. Ct. Rev. 25. No nos corresponde diseñar las normas que deben reglamentar las relaciones entre los profesores y las entidades que los agrupan.[16] La estructuración

---

[14]Este principio cobra mayor relieve en el caso de autos donde no se trata de proscribir una actividad continua sino unas visitas esporádicas.

[15]En ocasión en que se enfrentara a hechos similares a los de autos, el Tribunal Supremo del estado de California llegó a un resultado análogo al que exponemos nosotros hoy, aplicando la Primera Enmienda de la Constitución federal estadounidense. *Los Angeles Teachers U.* v. *Los Angeles City Bd. of Ed.*, 455 P.2d 827 (1969).

[16]Procede, por ejemplo, que se elaboren normas que regulen aspectos tales como la antelación con que debe solicitarse el permiso—dando lugar así a que se

y control de las actividades escolares es prerrogativa de los oficiales escolares,([17]) dentro del marco de las fundamentales garantías constitucionales que cobijan la libre expresión y asociación. *Healy* v. *James*, 408 U.S. 169, 180 (1972). En las medidas que adopten al efecto han de proveerse los mecanismos para evitar conflictos entre entidades que agrupen a los maestros "con fines de promover su progreso social y económico, el bienestar general . . . y fomentar y estimular una actitud liberal y progresista hacia la administración pública, y promover la eficiencia en los servicios públicos", conforme lo autoriza la ley; cónsono con el mantenimiento del deseable sosiego en las aulas escolares y de la prestación a los estudiantes de la necesaria supervisión y compañía a que son acreedores; procurando en el proceso no menoscabar las garantías consagradas en la Constitución ni el balance que debe mantenerse entre la libertad de expresión y asociación por un lado, y las restricciones que son necesarias para mantener la paz y el orden en las aulas escolares.

*Por los antedichos fundamentos la sentencia del tribunal de instancia será confirmada.*

El Juez Asociado Señor Díaz Cruz suscribió voto disidente al que se une el Juez Asociado Señor Rigau; el Juez Asociado Señor Negrón García no intervino.

---

puedan sustituir los maestros que permanecen en vigilancia, a la vez que se evita conflicto con entidades rivales; el tipo de actividad a realizarse—de suerte que por su naturaleza no genere ruidos excesivos que redunden en desorden; y la época del año escolar en que deben llevarse a cabo—proveyendo para evitar que los períodos de evaluación, conferencias, etc. queden perjudicados.

([17])Una vez se adopte una norma razonable, su interpretación por las autoridades escolares debe ser objeto de gran deferencia ante los tribunales. *Wood* v. *Strickland*, 420 U.S. 308, 326 (1975); *Ingraham* v. *Wright*, 430 U.S. 651 (1977).

—O—

Voto disidente del Juez Asociado Señor Díaz Cruz al que se une el Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 27 de noviembre de 1979

El proselitismo de asociaciones o federaciones de maestros no debe perturbar el clima de estudio en el aula escolar. Los mismos fundamentos constitucionales que se aducen para permitir la irrupción anunciada de agentes sindicalistas en los predios del salón de clases, a mitad de jornada docente que es la hora de almuerzo, servirían a los organizadores de los partidos políticos[1] para reclamar tiempo igual en el curso del día de estudios. Tanto el líder de barrio organizador político como los activistas de sindicatos y asociaciones análogas están supeditados en su reclamo de libre expresión y asociación, al superior derecho constitucional del estudiante a una educación, cuidadosamente garantizado en el Art. II, Sec. 5, de nuestra Constitución, que ordena:

"Toda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales. Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria. La asistencia obligatoria a las escuelas públicas primarias, hasta donde las facilidades del Estado lo permitan, según se dispone en la presente, no se interpretará como aplicable a aquellos que reciban instrucción primaria en escuelas establecidas bajo auspicios no gubernamentales. No se utilizará propiedad ni fondos públicos para el sostenimiento de escuelas o instituciones educativas que no sean las del Estado. Nada de lo contenido en esta disposición impedirá que el Estado pueda prestar a cualquier niño servicios no educativos establecidos por ley para protección o bienestar de la niñez."

---

[1] El Art. 6 de nuestra Carta de Derechos extiende la libertad de organización y libre asociación a gran número de agrupaciones de carácter obrero, vocacional, profesional, *ideológico*, cívico, recreativo y cultural. (Informe de la Comisión de Carta de Derechos, *infra*, pág. 16.)

Precisamente para preservar los derechos fundamentales debe la escuela mantenerse libre de influencias ajenas al reposo académico. Así lo entendió la Comisión de Carta de Derechos de la Convención Constituyente, en su informe de 14 de diciembre de 1951, a cuyas páginas 12 y 13 se expresa así:

"El establecimiento de un sistema de instrucción pública libre y enteramente no sectario es una consecuencia natural de los postulados anteriores [esencial dignidad e igualdad humana, sufragio universal, libertad de culto, de palabra, de prensa, de reunión y de petición]. La sociedad democrática tiene la obligación de proveer para que a las nuevas generaciones se les trasmita el conocimiento, los valores, las técnicas, las aptitudes que el continuado esfuerzo de siglos ha traducido en patrimonio de la vida civilizada. Ya en la primera Sección se hacía referencia al sistema de instrucción pública para imponerle la responsabilidad de educar en los principios de esencial igualdad humana. Hay desde luego, una íntima correspondencia entre la cultura y la ley. Las directrices vitales contenidas en una constitución derivan parte substancial de su eficacia del aprecio habitual en que las tiene la ciudadanía. La escuela pública ha sido una de las mayores fuerzas de democracia, de unidad colectiva y de oportunidad abierta al talento en la vida puertorriqueña. En su salón de clase se han educado codeándose hombres y mujeres de todas las clases sociales, de todas las religiones, de todos los grupos políticos, de todas las razas. En ella han aprendido la igualdad, la tolerancia, el esfuerzo. Debe continuar y ampliar ésta su responsabilidad y trayectoria. El sistema educativo ha de continuar como hasta ahora, siendo completamente no sectario."

El compromiso del Estado con la instrucción pública sólo puede cumplirse en la escuela. Los organizadores laborales y políticos en cambio tienen a su disposición todo el tiempo y lugar no ocupado por la jornada docente. Y no se diga que el proselitismo del líder obrero es distinto al del capitán de precinto porque en Puerto Rico las fronteras entre uno y otro tipo de agrupación son ilusorias, o inexistentes o evanescentes.

No hay que buscar prueba en el récord indicativa de lo que será una escuela convertida en terreno de lucha sectaria, alojando en el corazón mismo del recinto donde se enseña a pensar y a honrar la universalidad de las ideas, elementos que

provocarán fricción, disgusto, altercados y hasta violencia porque su particular propaganda necesariamente no ha de tener acogida unánime entre el profesorado, y los opositores a determinado agitador u organizador no van a cruzarse de brazos frente a la impropia intervención en la paz académica. El timbre que marca la terminación del receso para almuerzo, no va a cortar allí y entonces la grave lesión al clima de estudio; los efectos venenosos de la introducción de la agitación gremial y el proselitismo político en la escuela perdurarán cuando ya se haya marchado el último de sus agentes al igual que el manto de radioactividad queda después de la fisión nuclear. La escuela convertida en este campo de lucha(²) es la antítesis del derecho de toda persona "a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales". Por su propia excelencia fundida en la doctrina de interés dominante del Estado, la educación ocupa un primer plano de calidad que cobra particular valía en Puerto Rico donde el derecho a instruirse ha alcanzado afirmación expresa en la Constitución del Estado Libre Asociado. El alto relieve y jerarquía de este derecho del hombre(³) y la presencia de una política pública que año tras

---

(²)El notorio estado de pugna incontrolable que en proporción determinante ya estremece la urdimbre de nuestra sociedad, ha sido expuesto por el eminente educador don Jaime Benítez en su artículo "El Deteriorado Debate Público", en el periódico El Mundo, del 27 de octubre de 1979, pág. 9-A, así:

"Por la ruta que lleva la controversia pública, por las actitudes que la determinan, por las reacciones que ese estilo de debate provoca, los puertorriqueños no caminamos hacia una sociedad más justa ni más libre ni más unida. Tampoco vamos al encuentro de un mejor destino. Marchamos hacia el encontronazo de unos contra otros rumbo de una estéril lucha fratricida.

"Mientras la contienda se enardece y desmesura, un creciente grupo de personas capacitadas para desempeñar responsabilidades colectivas se desentiende de ellas, opta por encontrar falta en privado mientras calla en público, atiende sus propios intereses, aislados de su medio, o aprovecha su superior entrenamiento para buscar tarea fuera. Este descenso en la calidad de la vida pública y esa deserción de ella de los más aptos se manifiesta en las instituciones profesionales, en el sector laboral, en la educación, en la política."

(³)El derecho a la educación aparece proclamado en el Art. XII, Cap. I de la "Declaración Americana de los Derechos y Deberes del Hombre"; en el Art. II de la

año canaliza hacia la instrucción la proporción mayor de los recursos del Erario en esfuerzo "constante y desesperado por extender sus beneficios a toda la comunidad"(⁴) fueron acertadamente señalados en la compilación de informes a la Convención Constituyente de la Escuela de Administración Pública de la Universidad bajo el título de *La Nueva Constitución de Puerto Rico*, págs. 225–226, así:

"Los nuevos derechos económicos y sociales son parte indispensable de la libertad. Sin ellos ésta es, a lo sumo, una realidad incompleta. Para la gran mayoría del pueblo no pasa de ser una fórmula retórica. Por más que se insista en el concepto negativo de que la libertad es ausencia de restricciones externas y en consecuencia se limiten al mínimo las funciones de la sociedad y del Estado, lo cierto es que nadie puede disfrutar el verdadero valor de la libertad—que consiste en el pleno desarrollo de la personalidad humana—si no cuenta con los medios materiales y espirituales que se necesitan, ni con la ayuda de la sociedad para conseguirlos.

Si las facilidades materiales son medios indispensables, sin los cuales la subsistencia está en peligro, la educación y la participación en la vida cultural de la comunidad son ya la libertad misma, la expresión y el perfeccionamiento de lo que es esencialmente humano. El desarrollo espiritual de los ciudadanos es, por lo tanto, uno de los fines primordiales del orden social. Así como la libertad no es antítesis, sino objetivo de la ordenación social, la educación por la libertad es uno de los deberes cardinales del Estado. Su valor es tanto social como individual. Es una de la bases de la democracia."

La decadencia de la educación nos enfila en ruta de reversión y arriesga preciados valores de civilización, entre ellos los derechos fundamentales que los recurridos justamente disfrutan. De inmediato nos destacaríamos como jurisdicción donde la paz del recinto escolar tiene menos protección que la

Declaración de los Derechos Humanos Esenciales (propuesta por American Law Institute a O.N.U.); y en el Art. 26 de la Declaración Universal de Derechos del Hombre (Naciones Unidas, 10 dic. 1948) que en parte expresa: "Toda persona tiene derecho a la educación . . . [que] tendrá por objeto el pleno desarrollo de la personalidad humana y el fortalecimiento del respeto a los derechos del hombre y a las libertades fundamentales." La Nueva Constitución de Puerto Rico, págs. 231–250.

(⁴)La Nueva Constitución de Puerto Rico, pág. 226.

extendida por el Tribunal Supremo de los Estados Unidos a establecimientos comerciales contra la actividad de piquetes. *Cf. Central Hardware Co.* v. *NLRB*, 407 U.S. 539 (1972); *Hudgens* v. *NLRB*, 424 U.S. 507 (1976); *Lloyd Corp.* v. *Tanner*, 407 U.S. 551 (1972).

Es de conocimiento universal que la actividad sindical por naturaleza está cargada de pasión y de energía desbordada que si bien cumple un propósito respetable en el taller y la fábrica, resulta irreconciliable con la reposada dedicación a la enseñanza y el aprendizaje, el sosegado análisis y la moderada discusión de ideas en el salón de clases. Ya este Tribunal percibió de cerca los feos desarrollos que genera la contienda laboral en las escuelas cuando hubimos de decidir si la amnistía concedida por el Secretario de Instrucción ι los maestros huelguistas se extendía a la agresión por uno de ellos al esposo de una maestra que la acompañó ese día hasta el salón de clase. *Srio. de Instrucción* v. *Quiñones Díaz*, 108 D.P.R. 344 (1979).

La Ley de Evidencia no exige prueba de lo que es notorio. (Regla 11(A)(1) de Evidencia (1979).) La preterición en la opinión del derecho constitucional a una educación libre, no sectaria, y su considerable dependencia en falta de prueba de lesión a la docencia, en una situación palmaria y patente de la que venimos obligados a tomar conocimiento aun en etapa de revisión (Regla 11(D)), enervan los fundamentos de decisión y su enajenación de la circunstancia vital de nuestra patria la reduce a proposición utópica.

Por considerar que bajo nuestra Carta de Derechos el reglamento impugnado guarda armonía con el mandato constitucional, estimo que la sentencia del Tribunal Superior debe ser revocada.