En el Tribunal Supremo de Puerto Rico

| LEOPOLDO HERNANDEZ ESTRELLA<br>    Rrecurridos<br><br>V.<br><br>JUNTA DE APELACIONES DEL SISTEMA DE EDUCACION PUBLICA<br><br>DEPARTAMENTO DE EDUCACION<br><br>    Peticionaria | Certiorari<br><br>99TSPR30 |

Número del Caso: CC-97-437

Abogados de la Parte Peticionaria: Hon. Carlos Lugo Fiol
Procurador General

Lic. Carmen A. Riera Cintrón
Procuradora General Auxiliar

Abogados de la Parte Recurrida: Lic. Angel Raúl Pérez Muñiz

Abogados de la Parte Interventora:

Tribunal de Instancia: JUNTA DE APELACIONES DEL SISTEMA DE EDUCACION PUBLICA

Juez del Tribunal de Primera Instancia:

Tribunal de circuito de Apelaciones: I SAN JUAN

Panel integrado por:  Pres. la Juez Fiol Matta, la Juez Rodríguez de Oronoz y el Juez Gierbolini

Juez Ponente: Hon. Gilberto Gierbolini

Fecha: 3/24/1999

Materia:

        Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Leopoldo Hernández Estrella,
et al.

    Recurridos

        v.                  CC-97-437     Certiorari

Junta de Apelaciones del
Sistema de Educación Pública

Departamento de Educación

    Peticionarios

Opinión del Tribunal emitida por el Juez Asociado señor Negrón García

San Juan, Puerto Rico, a 24 de marzo de 1999

I

**El 5 de abril de 1996, Leopoldo Hernández Estrella, Carmen Vázquez De Jesús e Ileana Parés Rivera, maestros de la Escuela Ana Roque, Humacao, durante horas de clase se ausentaron de sus labores docentes y trasladaron frente a la Escuela Petra Mercado del mismo distrito escolar para participar en un piquete.**

El piquete, realizado pacíficamente, fue organizado por un grupo de empleados docentes de la Escuela Petra Mercado. Tenía el propósito de repudiar la gestión administrativa de la directora de dicho plantel.

El 7 de abril, el Secretario de Educación, mediante comunicación escrita, les imputó conducta altamente repudiable, causa suficiente para destituirlos. No obstante, se limitó a amonestarlos y les notificó que dicha amonestación formaría parte de sus expedientes de personal. Varios maestros del plantel en que se dio la protesta, también fueron sancionados.

El 26 de abril apelaron ante la Junta de Apelaciones del Sistema de Educación Pública, (JASEP). Solicitaron se dejara sin efecto la amonestación escrita, aduciendo que ello limitaba y coaccionaba a los empleados de dicha agencia en el ejercicio de su libertad de expresión y asociación. El 5 de junio, JASEP acogió recomendación del Oficial Examinador y confirmó la actuación del Secretario.[1]

Oportunamente, los maestros acudieron en revisión al Tribunal de Circuito de Apelaciones. El 30 de abril de 1997, dicho foro apelativo (Hons. Fiol Matta, Rodríguez de Oronoz y Gierbolini), revocó. **Resolvió que la manifestación llevada a cabo no era del tipo huelgario y sí, un ejercicio legítimo de libertad de expresión sobre un asunto de preocupación pública, no de interés personal.** A la luz de Velázquez v. A.M.A., res. en 15 de septiembre de 1992, y el balance de intereses allí establecido, sostuvo que procedía el descuento del salario de los días de ausencia pero no la amonestación por escrito, por ser una medida disciplinaria prevista para la participación de maestros **en huelgas.**

_____

[1] El 3 de julio de 1996, JASEP declaró no ha lugar una reconsideración.

Aplicó además, la norma penal prohibitoria de doble penalidad por una misma falta. A solicitud del Depto. de Educación expedimos certiorari.[2]

## II

Dirimir la presente controversia exige, de entrada, cualificar la actividad llevada acabo por los maestros. ¿Fue de tipo huelgario? ¿Está protegida por la libertad de expresión a la luz de la normativa vigente?

Los maestros sostienen, y así lo estimó el Tribunal de Circuito, que su participación en un piquete frente a una escuela distinta a la de ellos, organizado por los maestros de ese plantel escolar, no era de tipo huelgario sino un ejercicio de su libertad de expresión. Argumentan que, en su plantel "no había ningún conflicto ni dilema en comparación con la Escuela Petra Mercado, donde sí existía un problema entre la facultad, padres, estudiantes y la directora". Aducen que aun cuando las labores docentes y lectivas se afectaran en dicho plantel, **el suyo no se afectó.** Exponen que su ausencia no deterioró la organización escolar.

---

[2] Plantea:

"A. Erró el Hon. Tribunal de Circuito de Apelaciones al determinar que el piquete al que asistieron los aquí recurridos en horas laborables constituyó un ejercicio válido de la libertad de expresión, y que por lo tanto no procede la amonestación por escrito.

B. Erró el Hon. Tribunal de Circuito de Apelaciones al determinar que aplica la norma contra la imposición de doble penalidad por una misma falta."

En su sustrato, la posición de los maestros parte de la premisa de que cada plantel escolar es una entidad distinta e independiente de las demás, desconectada del sistema integral de educación pública. Sostienen que su interés en la manifestación no respondió a reclamos de índole laboral pues en su plantel no existían divergencias laborales.

El Departamento de Educación Pública constituye un sistema integrado dirigido por un Secretario, quien ejerce "todas las funciones ejecutivas, administrativas, operacionales, de supervisión y planificación de su Ley Orgánica". 3 L.P.R.A. sec. 391 et seq. Aunque se delega a los directores de cada escuela la autoridad y autonomía necesaria para realizar ciertas funciones y tomar las decisiones que correspondan para el buen funcionamiento de la escuela, **ello no desmembra al sistema pues dicha autonomía administrativa está sujeta y tiene que ser cónsona con los parámetros de la Ley Orgánica.** Esta realidad jurídica y administrativa resta validez al planteamiento de los maestros de que por no haber problemas laborales en su escuela, la participación en el piquete de otro plantel escolar, no era de naturaleza huelgaria. Por su pertinencia, es importante señalar que varios maestros de la Escuela Petra Mercado sancionados por los mismos hechos, en su solicitud de revisión al Tribunal de Circuito de Apelaciones,[3] admitieron que recurrieron al piquete

---

[3] Casos KLRA9600378; KLRA9600379.

porque el Depto. de Educación ignoraba sus reclamos contra la directora.[4] En efecto, era una protesta íntimamente relacionada con las condiciones de trabajo. Los maestros de autos, aceptan que el propósito del piquete fue repudiar la forma en que la directora administraba el plantel Petra Mercado y su relación con los empleados, maestros y estudiantes.[5] **Forzoso concluir que el piquete llevado a cabo era de naturaleza laboral**. Además, al ellos ausentarse y abandonar sus labores docentes en la Escuela Ana Roque, -distinto a su contención-, **también** afectaron e interrumpieron las labores de dicho plantel; **en suma, afectaron las dos escuelas**.

Las secs. 17 y 18 del Art. II de nuestra Constitución -rectoras del derecho de los empleados a organizarse y negociar con sus patronos, así como realizar huelgas, piquetes y cualquier otra actividad lícita-, **excluyó de su cobertura a los empleados del Gobierno, sus agencias o instrumentalidades que no funcionan como empresas o negocios privados**. 3 Diario de Sesiones de la Convención Constituyente, págs. 2574-2575. Ada Santos y otros v. Municipio de Comerío, res. en 8 de enero de 1997; J.R.T. v. Asociación de Servicios Médicos Hospitalarios, 115 D.P.R. 360 (1984); A.A.A. v. Unión Empleados A.A.A.,

---

[4] El Tribunal de Circuito de Apelaciones, el 18 de diciembre de 1996, confirmó la acción del Departamento.

[5] A esto se une el hecho de que luego del piquete, los manifestantes se trasladaron a las oficinas centrales del Departamento de Educación, para una vez más exigir sus reclamos.

105 D.P.R. 437 (1976). Por consiguiente, los maestros, como empleados del Depto. de Educación de Puerto Rico –agencia gubernamental que no funciona como empresa o negocio privado–, **no tienen derecho a la huelga**, pues no están amparados por dicha disposición constitucional. Los constituyentes dejaron en manos de la Asamblea Legislativa establecer la forma en que iba a tratarse a estos empleados. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, Ed. U.P.R., 1982, T. III, págs. 199 y ss. Esta conclusión no dispone totalmente del recurso. Aun cuando hubiésemos coincidido con la tesis de los maestros de que la actividad no fue del tipo huelgario, tampoco tendrían razón a base del alegato de que fue un ejercicio de su libertad de expresión. Veamos.

### III

Los maestros sostienen que la manifestación en la que participaron fue una protesta en el ejercicio de su derecho constitucional a expresarse libremente sobre asuntos de interés público.

En Velázquez v. A.M.A., supra, señalamos que aunque "no es permisible dentro de nuestro orden constitucional, que un ciudadano tenga que renunciar al ejercicio de su derecho a la libre expresión como condición a obtención de un empleo público" y que en el ámbito del magisterio público, la libertad de palabra y asociación, también cobija a los maestros y estudiantes aún dentro del plantel, Rodríguez v. Srio. de Instrucción, 109 D.P.R. 251 (1979), tal derecho no era absoluto ni toda conducta está

constitucionalmente protegida. Es preciso "sopesar el alcance de la restricción a la libre expresión y asociación, y la importancia del interés gubernamental que anima la restricción, a la luz de la amenaza que la conducta impedida representa para tal interés del Estado." Mari Brás v. Casañas, 96 D.P.R. 15, 21 (1968). Cuando la conveniencia y necesidad pública lo requiera, han de subordinarse a otros intereses. Rodríguez v. Srio. de Instrucción, supra, 255-256 (1979); Mari Brás v. Casañas, supra.

En Velázquez v. A.M.A., supra, adoptamos la normativa federal ante reclamos de libertad de expresión de empleados públicos. **Resolvimos que las expresiones de empleados públicos resguardadas por la Constitución son las concernientes a asuntos de preocupación pública: no las que sólo responden a intereses personales particulares**. De modo que, **primero**, como cuestión de derecho, debemos determinar si la expresión es sobre un asunto de interés público. De ser en la negativa, no se analizan las razones para la acción disciplinaria, ya que "[c]uando un empleado público se expresa, no como un **ciudadano** sobre asuntos de **interés público**, sino como un **empleado** sobre asuntos que son únicamente de **interés personal**" por lo general no está envuelta la libertad de expresión. (Traducción nuestra). Connick v. Myers, 461 U.S. 138, 147 (1983). Renfroe v. Kirkpatrick, 722 F. 2d. 714 (1984); Ballard v. Blount, 581 F. Supp. 160 (1983) cert denegado, 105 sct. 590 (1984). **Segundo**, de estar envuelto un asunto de interés público, el

empleado debe demostrar, como cuestión de hecho, que **su expresión fue factor substancial en la decisión del patrono**. Rodríguez Cruz v. Padilla, 125 D.P.R. 486 (1990); McCrillis v. Autoridad de Navieras, 123 D.P.R. 113 (1989); Givhan v. Western Line Consolidated School District, 439 U.S. 410 (1979); Mt. Healthy City School District v. Doyle, 429 U.S. 274, (1977). **Tercero**, de haber sido factor substancial, es preciso analizar entonces si la **acción disciplinaria estuvo justificada y debe prevalecer**. En esa tarea es menester sopesar los intereses del empleado como ciudadano particular en expresarse libremente sobre dichos asuntos, y el del Estado en promover la mejor eficiencia y productividad en el servicio de educación pública. Stroman v. Colleton County School District, 981 F. 2d. 152 (1992); Pickering v. Board of Education, 391 U.S. 563 (1968); Maples v. Martín, 858 F. 2d. 1546 (1988); Ferrara v. Mills, 781 F. 2d. 1508 (1986); Connick v. Myers, supra. **Finalmente**, al hacer el balance ha de considerarse la autoridad o grado de responsabilidad del empleado en su lugar de trabajo. Ranking v. McPherson, 483 U.S. 378 (1987). Veamos.

IV

La expresión sobre asuntos de **interés público** protegida por la libertad de expresión, es la que atañe a asuntos de interés político, social u otra índole, para la comunidad, -Connick v. Myers , supra, pág. 146-, no asuntos vinculados a intereses propios y particulares del empleado. Lewis v. Blackburn, 734 F. 2d. 1000, 1012 (1984).

**No es de interés público**, "cuando la expresión versa sobre disputas y quejas individuales del personal, irrelevantes para la evaluación, por parte del público del desempeño de las agencias gubernamentales. Por otro lado, expresiones que tienen que ver con asuntos sobre los cuales la información es pertinente o necesaria para que los miembros de la sociedad tomen decisiones informadas sobre el funcionamiento de su gobierno, ameritan el más alto grado de protección conforme la [libertad de expresión]". (Traducción nuestra). Mckinley v. City of Eloy, 705 F. 2d. 1110, 1114 (1983). Hall v. Ford, 856 F. 2d. 255 (1988). "El principio dimanante es que toda expresión proveniente de un empleado público, cuyo contenido esté protegido por la libertad de expresión, tiene derecho, cuanto menos, a cierta protección cualificada contra acciones disuasivas del patrono, a excepción de las expresiones que, vistas de manera realista, son puramente de 'interés personal'... El enfoque es, por lo tanto, si el 'público' o la 'comunidad' tiende a preocuparse o interesarse de verdad en la expresión particular, o si a ésta se considera más bien como un asunto esencialmente privado entre patrono y empleado". (Traducción nuestra). Berger v. Battaglia, 779 F. 2d. 992, 998-999 (1985). (Citas omitidas).

Para determinar la naturaleza de la expresión, el Supremo Federal en Connick v. Myers, supra, estableció la necesidad de inquirir, **caso a caso**, sobre su **contenido**,

**forma** y **contexto.**[6] Indicó además, que si la expresión toca
de alguna forma, aunque limitada, asuntos de interés
público, debía considerarse protegida. Pág. 154. <u>Maples</u> v.
<u>Martín</u>, <u>supra</u>.

Similar al contenido de las expresiones en el caso
ante nos, en <u>Piver</u> v. <u>Pender Bd. of Educ.</u>, 853 F. 2d. 1076
(1987), se concibió como de interés público las expresiones
de una maestra sobre el desempeño del principal de la
escuela. Se señaló que era un asunto sobre el cual la
comunidad en la que ubicaba la escuela, tenía vital
interés. **En el de autos, las manifestaciones en repudio a
la forma en que la directora administraba el plantel**

---

[6] Siguiendo esta pauta, los tribunales federales han emitido numerosas decisiones. Las siguientes reconocen interés público en las siguientes expresiones: crítica a las prácticas de pago de salarios, <u>Stroman</u> v. <u>Colleton County School District</u>, <u>supra</u>; memorando discutiendo métodos y criterios de evaluación, <u>Hesse</u> v. <u>Bd. of Educ. of Township High School Dist.</u>, 848 F. 2d. 748 (1988); quejas sobre la matrícula de cursos y sus asignaciones, <u>Ferrara</u> v. <u>Mills</u>, <u>supra</u>; expresión del maestro sobre su indisponibilidad a ("job share"), <u>Renfroe</u> v. <u>Kirkpatrick</u>, <u>supra</u>; críticas a los niveles de salario, asignación de cursos, prontuarios de cursos propuestos y decisiones sobre permanencias ("tenure"), <u>Ballard</u> v. <u>Blount</u>, <u>supra</u>; <u>Hickman</u> v. <u>Valley Local School</u>, 619 F. 2d. 606 (1980); <u>Givhan</u> v. <u>Western Line</u>, <u>supra</u>.

Otras han rechazado su naturaleza pública: cuestionar la forma de manejar el presupuesto de la escuela, <u>Stroman</u> v. <u>Colleton County School District</u>, <u>supra</u>; alertar al público sobre las condiciones del departamento de educación, <u>Maples</u> v. <u>Martín</u>, <u>supra</u>; la política administrativa de una escuela de derecho y el tamaño de su población estudiantil, <u>Honore</u> v. <u>Douglas</u>, 833 F. 2d. 565 (1987); la no implementación de un programa para estudiantes con impedimentos, <u>Southside Public School</u> v. <u>Hill</u>, 82 F. 2d. 270 (1987); estándares educativos y de acreditación, <u>Johnson</u> v. <u>Lincoln University</u>, 776 F. 2d. 443 (1985); expresión relacionada al salario, <u>Mckinley</u> v. <u>City of Eloy</u>, <u>supra</u>; crítica a la conducta del supervisor, <u>Collins</u> v. <u>Robinson</u>, 568 F. Supp. 1464 (1983).

**escolar, y sus relaciones con los maestros, padres y estudiantes, a la luz de la normativa y jurisprudencia antes expuesta, encierran aspectos de preocupación e interés público, sobre todo, para la comunidad en la que se encuentra dicho plantel.**

V

Sin embargo, como hemos señalado, no es suficiente que la expresión sea de interés público y por lo tanto, protegida por libertad de expresión. El empleado tiene que demostrar que la motivación o factor substancial para tomar la acción disciplinaria fue en efecto, dicha expresión. De lograrlo, entonces el Estado tiene la oportunidad de probar que hubiera llegado a la misma decisión -sanción-, ausente la expresión protegida. Mt. Healthy City School v. Doyle, supra.[7]

En este extremo, de la propia amonestación surge que la participación de los maestros en la manifestación de protesta frente a la Escuela Petra Mercado, constituyó la única razón para la medida disciplinaria. Consignó, que por ausentarse de su plantel y abandonar sus responsabilidades académicas con el propósito de participar en el **piquete**[8],

---

[7] Flath v. Garrison Public School, 82 F. 3d. 244 (1996); Gates v. Walker, 865 F. Supp. 1222 (1994); Hatcher v. Bd. of Public Educ., 809 F. 2d. 1546 (1987); McDonough v. Trustees of University System of N.H., 704 F. 2d. 780 (1983); Hickman v. Valley Local School, supra; Givhan v. Western Line Consol. School Dist., supra.

[8] Se define como "pequeño grupo de personas que exhibe pancartas con lemas, consignas políticas, peticiones, etc." Diccionario de la Lengua Española, (21ra. ed.) Ed. Espasa-Calpe, Madrid, 1992. Por imperativo constitucional, hemos reconocido la prerrogativa a realizar **piquetes** como parte

se les amonestaba por escrito y unía a sus expedientes de personal. Concluimos pues, que la expresión de los maestros a través del piquete fue el factor substancial para adoptar la acción disciplinaria.

VI

Ahora bien, una vez establecido que dichas expresiones -protegida constitucionalmente por ser de interés público-, fueron el factor substancial por lo cual se les amonestó, procede hacer un balance entre el interés de los maestros en expresarse y el del Estado en promover la mejor eficiencia y productividad del servicio público a través de sus empleados. "La interrogante de si las expresiones de un empleado están protegidas constitucionalmente es un asunto diferente de la interrogante fundamental de si el patrono ha violado el derecho del empleado a la libertad de palabra". (Traducción nuestra). Ferrara v. Mills, supra, 1513 (1986); Berry v. Bailey, 726 F. 2d. 670 (1984).

En Pickering v. Board of Education, supra, 568 (1968), el Supremo Federal expresó que "en cualquier caso, el problema consiste en lograr un balance entre los intereses de los maestros, como ciudadanos, al comentar sobre asuntos

---

del derecho a la libertad de expresión. Constitución E.L.A., Art. III, sec. 18; Morales Morales v. E.L.A., 126 D.P.R. 92 (1990); A.A.A. v. Unión Empleados A.A.A., supra; J.R.T. v. Club Deportivo, 84 D.P.R. 515 (1962). Aunque, unido al reconocimiento de su valor intrínseco, hemos rechazado el reclamo de que sea absoluto, incapaz de subordinarse a otros intereses en circunstancias en que la convivencia y necesidad pública así lo exijan. Rodríguez v. Srio. de Instrucción Pública, supra; E.L.A. v. Rivera Rivera, 105 D.P.R. 640 (1977); A.A.A. v. Unión Empleados A.A.A., supra; E.L.A. v. Hermandad, 104 D.P.R. 436 (1975).

de interés público, y los intereses del Estado, como patrono, al promover la eficiencia de los servicios públicos que brinda a través de sus empleados". (Traducción nuestra). Aunque este balance se ha de aplicar caso a caso, el Supremo Federal ha mencionado varios factores a considerar: **tiempo, lugar, manera y contexto de la expresión; efecto en la autoridad disciplinaria de los superiores, en la armonía laboral, en el desempeño eficiente de los deberes del empleado y sí interfiere con las operaciones regulares y normales de la institución.** Maples v. Martín, supra; Ranking v. McPherson, supra; Eiland v. Montgomery, 797 F. 2d. 953 (1986) cert. denied 107 SCT 3263 (1987). En Pickering v. Board of Education, supra, al dar varios ejemplos de instancias en que el interés del empleado en expresarse libremente sobre asuntos públicos cede ante el interés del Estado en descargar eficientemente sus responsabilidades, el alto foro federal **indicó que el interés del Estado debe prevalecer cuando la expresión del empleado afecta su desempeño en el trabajo, la armonía de sus compañeros o de otra forma impide las operaciones normales de la institución.**[9] En Fergunson v. Thomas, 430 F. 2d. 852, 859 (1970), el Tribunal expresó que el patrono no tiene "derecho a controlar las expresiones [del maestro] o restringir su libertad de asociación, pero

---

[9] Derrickson v. Board of Educ., 738 F. 2d. 351 (1984); Connick v. Myers, supra; Lusk v. Estes, 361 F. Supp. 653 (1973); Adock v. Board of Educ. 513 P. 2d. 900 (1973); Duke v. North Texas, 469 F. 2d. 726 (1972); More v. Winfield City, 452 F. 2d. 726 (1971); Yven v. Bd. of Educ., 222 N.E. 2d. 570 (1966).

sí el derecho de dar por terminado su empleo en el momento en que el ejercicio de sus privilegios constitucionales claramente pese más que su utilidad".(Traducción nuestra). **"La educación pública es reconocida como uno de los servicios públicos más importantes ofrecidos por el Estado y el mantenimiento de maestros profesionales y dedicados para proveer dicho servicio, un interés de los de más alto rango"**. (Traducción nuestra). Stroman v. Colleton County School Dist., supra, 158 (1992).

### VII

Los maestros Hernández Estrella, Vázquez De Jesús y Parés Rivera, se ausentaron de su lugar de trabajo –Escuela Ana Roque– para participar en un piquete frente a la Escuela Petra Mercado, **en solidaridad con los maestros y estudiantes de dicho plantel**. Al contrastar su interés en **repudiar el modo en que la directora** conducía las actividades administrativas y las relaciones entre los empleados y directivos en dicho plantel –asunto de interés público–, con el interés del Estado, concluimos que la sanción impuéstale estuvo **justificada y fue razonable. La actividad no podía realizarse durante horas laborables**. Con su conducta ese día, alteraron las tareas y actividades escolares que, como maestros, debían ofrecer en **ambas** escuelas. Ciertamente afectaron la enseñanza que debían recibir los estudiantes que acudieron a sus salones de clases. En las agencias e instrumentalidades públicas la responsabilidad del empleado es directa e indeclinable para con la ciudadanía; detener los servicios que ofrecen, es

paralizar <u>pro-tempore</u> el cumplimiento de esas responsabilidades.

El Art. 3 de la Ley Núm. 115 del 30 de junio de 1965,[10] impuso como deberes magisteriales del sistema de educación pública, entre otros y en lo pertinente: "[a]sistir al trabajo con regularidad y puntualidad, y cumplir la jornada de trabajo establecida; [r]ealizar eficientemente y con diligencia las tareas y funciones asignadas a su puesto y otras compatibles con las que se le asignen, y [c]umplir con las disposiciones de las leyes y reglamentos aplicables al Depto. de Educación y con las órdenes emitidas en virtud de las mismas." Por su parte, la Ley Orgánica de dicho Depto. expresa que "[l]a función principal del maestro... es impartir la enseñanza [....] preparar a los alumnos para que alcancen el máximo desarrollo intelectual, moral y social, dentro del marco de sus aspiraciones y responsabilidades." **Ley Núm. 68 de 28 de agosto de 1990.** Además, autorizó al Depto. tomar las medidas necesarias para asegurar la mayor calidad en la práctica profesional del personal docente. Como corolario, el Art. 2 de la Ley Núm. 78 de 28 de agosto de 1991,[11] provee las medidas correctivas y el procedimiento a seguir por el Secretario ante violaciones del Reglamento del personal docente o la Ley Orgánica: amonestación verbal, **reprimendas escritas,**

---

[10] Según enmendada por la Ley Núm. 78 de 28 de agosto de 1991, 18 L.P.R.A. sec. 274-2.

[11] Enmendó Ley Núm. 115 de 30 de junio de 1965.

suspensión de empleo y sueldo y destitución. 18 L.P.R.A. sec. 274-1.

**Fuera de horas laborables, sin ausentarse ni abandonar sus responsabilidades, los maestros tienen a su disposición gran variedad de medios para protestar y manifestar su repudio a prácticas administrativas; de nuevo, sin alterar o menoscabar el servicio para el cual fueron empleados: la enseñanza pública, primordial e importante encomienda.**

VIII

Como fundamento adicional, el Tribunal de Circuito también concluyó que la sanción impuesta -amonestación escrita- no procedía, toda vez que los maestros recibieron el descuento de su salario por el día en que se ausentaron. Adujo, que aplicaba la norma del ordenamiento criminal, prohibitoria de doble penalidad por la misma falta. **Incidió.**

Aunque en principio podemos aplicar normas de derecho penal a procedimientos administrativos -cumpliendo claro está, con los criterios expuestos jurisprudencialmente-,[12] los hechos ante nos **no** revelan una cuestión de doble pena por una sola conducta. La única pena impuesta fue la amonestación escrita. **El descuento del sueldo no obedeció a esa conducta ilegal, contraria al reglamento de los**

---

[12] Se analizan los fundamentos y propósitos de la norma a aplicar así como el propósito y consecuencias del proceso administrativo al cual se quiere aplicar la norma penal. Si la norma cumple los mismos fines en el proceso administrativo y no ocasiona descalabro, procede aplicarse. Pagán Hernández v. U.P.R., 107 D.P.R. 720 (1978).

**maestros, sino al hecho de que no prestaron los servicios por los cuales reciben paga.**

Se dictará sentencia revocatoria.


ANTONIO S. NEGRÓN GARCÍA
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Leopoldo Hernández Estrella,
et al.

   Recurridos

      v.                              CC-97-437        Certiorari

Junta de Apelaciones del
Sistema de Educación Pública

Departamento de Educación

   Peticionarios

SENTENCIA

San Juan, Puerto Rico, a 24 de marzo de 1999

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente, se revoca la Sentencia del Tribunal de Circuito de Apelaciones de fecha 30 de abril de 1997.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Hernández Denton disiente por entender que se debía confirmar la Sentencia del Tribunal de Circuito de Apelaciones. Considera que dicho foro correctamente resolvió que procedía el descuento salarial por los días de ausencia, pero no la amonestación escrita. La imposición de una segunda medida disciplinaria esencialmente constituye una sanción irrazonable por el ejercicio legítimo de la libertad de expresión. El Juez Asociado señor Fuster Berlingeri emitió Opinión Disidente.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Leopoldo Hernández Estrella,
Carmen Vázquez de Jesús, etc.

    Demandantes-Recurridos


           vs.                    CC-97-437    Certiorari


Junta de Apelaciones del Sistema
de Educación Pública

    Demandada-Peticionaria


Opinión Disidente emitida por el Juez Asociado señor FUSTER BERLINGERI.


           San Juan, Puerto Rico, a 24 de marzo de 1999.



        En el caso de autos, los recurridos, maestros de una escuela pública, se ausentaron de sus labores docentes para participar en un piquete de protesta que padres, estudiantes y maestros de otra escuela organizaron para repudiar la manera en que la directora administraba dicha escuela.  La protesta fue realizada durante horas de un día, de forma pacífica, en lugares públicos propios para este tipo de actividad.

        Por razón de la conducta referida, a los maestros recurridos se les hizo **un descuento salarial** por el día que se ausentaron de sus labores docentes.  Además, el Secretario de Educación les notificó

**una amonestación escrita**, --que se hizo formar parte de sus expedientes de personal-- en la cual le indicaba expresamente a cada maestro que su participación en el piquete de protesta no sólo constituía "un abandono de servicio", sino que, además, constituía **"una crasa violación"** a varias disposiciones legales, por lo que el maestro había incurrido, entre otras, en la siguiente conducta flagrante:

(1) "conducta desordenada, incorrecta o lesiva al buen nombre del Sistema de Educación Pública";

(2) "prevaricación, insubordinación, soborno o conducta inmoral."

El Secretario también determinó en dicha amonestación que la conducta de cada maestro referido era "altamente repudiable y constituye causa suficiente para su destitución". Le expresaba asimismo el "más enérgico repudio" a la conducta referida, y advertía que si el maestro volvía a incurrir en tal conducta, se tomarían "medidas más severas en su contra".

La mayoría del Tribunal determina que la doble sanción que el Secretario le impuso a cada uno de estos maestros --el descuento salarial y la amonestación escrita-- estuvo justificada y fue razonable. Disiento de este dictamen.

I

Estoy conforme con lo dispuesto por la mayoría respecto al **descuento salarial**. No cabe duda de que los maestros recurridos se ausentaron por un día de sus labores docentes, por lo que no tenían derecho a recibir paga por servicios que no prestaron.

También estimo que el Secretario de Educación podía escribirle a estos maestros, indicándoles que en la ocasión referida no habían cumplido con su deber de observar los horarios de trabajo, y advirtiéndoles que otras ausencias futuras conllevarían sanciones más

severas.  Ciertamente, las ausencias frecuentes no autorizadas o un patrón de abandono de las labores son causa suficiente para la destitución del empleado público.  Rodrigo v. Tribunal Superior, 101 D.P.R. 151 (1973); Lebrón v. Jta. de Personal, 100 D.P.R. 164 (1971).

Lo que el Secretario no podía hacer era reprochar a los maestros por la naturaleza de la actividad realizada por éstos, ni repudiarla oficialmente en la términos en que lo hizo.  Para todos los efectos, el Secretario de Educación determinó que era ilícita, no sólo la ausencia del trabajo, sino el mismo piquete de protesta en el cual los maestros participaron.  Tal proceder del Secretario, realizado en su carácter oficial como tal, y con un evidente propósito y efecto intimidante, constituyó una actuación gravemente impropia de éste, por atentar contra los derechos de expresión garantizados por la Constitución del Estado Libre Asociado de Puerto Rico.  Veamos.

II

Como hemos señalado antes, nuestra Constitución consagra en forma inequívoca la primacía que goza en nuestro país la libertad de expresión y el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios.  Mari Brás v. Casañas, 96 D.P.R. 15 (1968).  En la Asamblea Constituyente se consignó de modo diáfano que la disposición constitucional sobre la libertad de conciencia, de pensamiento y de expresión garantizaba **"ejercitar a plenitud dentro de la más dilatada libertad la totalidad de estos derechos"**.  Diario de Sesiones de la Convención Constituyente de Puerto Rico (Equity, 1961), Vol. 4, pág. 2564.  Como reiteráramos en Aponte Martínez v. Lugo, 100 D.P.R. 282, 285 (1971), "el derecho a la crítica fuerte, alerta, severa, apasionada aun, no puede ser restringido.  Corresponde a los ciudadanos de un pueblo libre.  Es suyo y nadie puede arrebatárselo.  Sobre eso no hay duda alguna."

Ya antes hemos señalado también que por tratarse de derechos fundamentales los de expresión, estamos obligados "a su más celosa

protección", P.R.T.C. v. Unión Indep. Emp. Telefónicos, 131 D.P.R. 171 (1992); Rodríguez v. Srio. de Instrucción, 109 D.P.R. 251, 255 (1979). También hemos resuelto que los maestros de escuelas públicas tienen derecho a ejercer su libertad de expresión y asociación, aun dentro de los predios escolares, que de ordinario no son lugares preferidos para ello. Rodríguez v. Srio. de Instrucción, supra, a las págs. 257-258. Tanto más pueden ejercerlos, cuando lo hacen, como sucedió en este caso, durante el día en foros públicos considerados tradicionalmente como los sitios por excelencia para la expresión de ideas y para la crítica al gobierno. Más aun, expresamente hemos resuelto que dentro de nuestro orden constitucional no es permisible que para ocupar un empleo público, una persona tenga que renunciar al ejercicio de su derecho a la libre expresión. Velázquez Pagán v. A.M.A., 131 D.P.R. 568 (1992).

Claro está, ni siquiera los fundamentales derechos de expresión y asociación son absolutos. Su plena vigencia y protección presupone que serán ejercitados respetándose los derechos esenciales de otras personas y los intereses apremiantes de la colectividad, como corresponde en un sistema de libertad ordenada como es el nuestro. Así pues, los piquetes de protesta no gozan de protección constitucional si se realizan de manera estrepitosa, en horas de la noche y en un área residencial privada. E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436 (1975). Tampoco puede el empleado público utilizar los medios y recursos que su cargo pone a su alcance, para adelantar fines político-partidistas, Herminia González v. Srio. del Trabajo, 107 D.P.R. 667 (1978), o para adelantar sus propios intereses laborales en detrimento de la integridad de las funciones gubernamentales. U.N.T.S. v. Srio. de Salud, opinión de 16 de abril de 1993, 133 D.P.R. ___, 93 JTS 58.


III

A la luz de estos principios, es evidente que el piquete de protesta de los maestros en cuestión **como tal**, constituía conducta

claramente protegida por nuestra Constitución. Fue una actividad pacífica, realizada ordenadamente en lugares propios para ello, durante horas del día, y **con el propósito de dilucidar un asunto público legítimo**. Si bien los maestros se ausentaron de su trabajo para participar en este piquete, ello de por sí no lo convertía en una actividad ilícita y repudiable, como la catalogó el Secretario de Educación. La falta incurrida por los maestros en este caso, de utilizar horas laborables para asistir al piquete, ameritaba el descuento salarial que les fue impuesto. Pero, como fue únicamente **una ausencia de un solo día**, un evento aislado, claramente diferente de un paro laboral indefinido, el Secretario no tenía autoridad para manchar el expediente personal de estos maestros de la manera flagrante en que lo hizo, ni para intimidarlos de ese modo respecto a futuros piquetes de protesta. La amonestación del Secretario, redactada en la manera ya relacionada, constituía un rechazo enérgico no sólo a la ausencia del trabajo, sino también a la libre expresión de ideas y a la crítica del gobierno. Su amenaza de sanciones más severas no se limitó a futuras ausencias, sino que era extensiva también al ejercicio de los derechos más fundamentales que garantizan nuestra Constitución, que el Secretario está compelido a respetar.

IV

Hay otra vertiente que debe ponderarse en este caso. Uno de los elementos más importantes y autóctono de nuestra propia Carta de Derechos es la responsabilidad que se le encomienda al sistema de instrucción pública del país de **impartir una educación que propenda al fortalecimiento del respeto de los derechos humanos y de las libertades fundamentales**. Artículo II, sección 5 de la Constitución del Estado Libre Asociado de Puerto Rico. Los que formularon nuestra Carta de Derechos pensaron que para asegurar el pleno disfrute de estos derechos y libertades, no bastaba con sujetar al Estado a ellos. Tampoco bastaba con la celosa protección que los tribunales le brindasen. Para ellos,

el logro de tan elevado fin, hacía necesario, además, asignarle al sistema de instrucción pública el cometido de impartir una educación que procurase inculcar en sus estudiantes el respeto a esos derechos y libertades. La fe en la educación de los autores de nuestra Constitución los llevó, pues, a constituir la instrucción pública en uno de los pilares sobre los cuales erigir una sociedad auténticamente libre y democrática. Véase, Constitucionalismo y Educación, XXVII Rev. de Derecho Puertorriqueño, Núm. 102, Feb.-Junio 1988, págs. 321-329.

A la luz de lo anterior, cabe preguntarse si el logro de la grave encomienda constitucional que se le hace al sistema de instrucción pública puede lograrse cuando su director principal desdeña que los maestros ejerzan sus derechos de expresión. Cabe preguntarse más aun, si esa grave encomienda puede lograrse cuando los propios maestros han sido castigados e intimidados por ejercer esos derechos.

Lo que se espera de todo un Secretario de Educación, a la luz del entramado constitucional sobre los derechos humanos y las libertades fundamentales, no es una conducta autoritaria y represiva, sino precisamente todo lo contrario: un proceder ejemplarizante y una altura de miras, que propicie el logro de la ingente encomienda que fija la Constitución.

Como en el caso de autos, la amonestación escrita en cuestión no compagina cabalmente con lo que manda y encarga la Constitución del Estado Libre Asociado de Puerto Rico, disiento del dictamen mayoritario que la avala en su totalidad.


                                        JAIME B. FUSTER BERLINGERI
                                              JUEZ ASOCIADO